ASSOCIATED ENTERPRISES, INC., ET AL. *v.*
TOLTEC WATERSHED IMPROVEMENT
DISTRICT

No. 71–1069.  Argued January 8, 1973—Decided March 20, 1973

*Henry A. Burgess* argued the cause and filed a brief for appellants.

*Fred W. Phifer* argued the cause and filed a brief for appellee.*

PER CURIAM.

In this case, we are confronted with an issue similar to the one determined today in *Salyer Land Co.* v. *Tulare Water District, ante,* p. 719.  Appellee Toltec Watershed Improvement District was established after referendum held pursuant to Wyoming's Watershed Improvement District Act, Wyo. Stat. Ann. §§ 41–354.1 to 41–354.26 (Supp. 1971).  After formation, appellee sought a right of entry onto lands owned by appellant Associated Enterprises, Inc., and leased by Johnston Fuel Liners, for the purpose of carrying out studies to determine the feasibility of constructing a dam and reservoir.  When Associated Enterprises resisted, the district sought to enforce its right in state court.  Arguing that the stat-

---

*Melvin L. Wulf, Sanford Jay Rosen, Joel M. Gora,* and *David Hall* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

utes authorizing the referendum violated the Equal Protection Clause since under § 41–354.9 only landowners are entitled to vote and under § 41–354.10 a watershed improvement district cannot be determined to be administratively practicable and feasible unless a majority of the votes cast, representing a majority of the acreage in the district, favor its creation, appellants maintained that the district was illegally formed. The trial court agreed that had the district been formed in violation of the Equal Protection Clause, appellants would have a good defense under state law to the asserted right of entry, but it held against them on the merits. The Wyoming Supreme Court affirmed. 490 P. 2d 1069.

Appellants urge here that the provisions entitling only landowners to vote and weighting the vote according to acreage violate the Equal Protection Clause. Like the California water storage district, the Wyoming watershed district is a governmental unit of special or limited purpose whose activities have a disproportionate effect on landowners within the district. The district's operations are conducted through projects and the land is assessed for any benefits received. Wyo. Stat. Ann. §§ 41–354.17, 41–354.21, 41–354.22. Such assessments constitute a lien on the land until paid. *Id.,* § 41–354.23.

We cannot agree with the dissent's intimation that the Wyoming Legislature has in any sense abdicated to a wealthy few the ultimate authority over land management in that State. The statute authorizing the establishment of improvement districts was enacted by a legislature in which all of the State's electors have the unquestioned right to be fairly represented. Under the act, districts may be formed only as subdivisions of soil and water conservation districts. *Id.,* § 41–354.3. And a precondition to their formation referendum is a determination by a board of supervisors of the affected conservation district, popularly elected by both occupiers

and owners of land within the district, that the watershed improvement district is both necessary and administratively practicable. *Id.,* §§ 41–354.7, 41–354.8; Wyoming Conservation Districts Law, Wyo. Stat. Ann. § 11–234 *et seq.,* § 11–243 (Supp. 1971). As in *Salyer, supra,* we hold that the State could rationally conclude that landowners are primarily burdened and benefited by the establishment and operation of watershed districts and that it may condition the vote accordingly. The judgment appealed from is, therefore,

*Affirmed.*

Mr. Justice Douglas, with whom Mr. Justice Brennan and Mr. Justice Marshall concur, dissenting.

I

For the reasons set forth in my dissenting opinion in *Salyer Land Co.* v. *Tulare Water District, ante,* p. 735, I cannot agree that the voting provisions of Wyoming's Watershed Improvement District Act pass muster under the Equal Protection Clause. Accordingly, I dissent.

At issue is Wyoming's Watershed Improvement District Act, Wyo. Stat. Ann. §§ 41–354.1 to 41–354.26 (Supp. 1971). Appellee Toltec Watershed Improvement District was established as a result of a referendum held pursuant to this Act, May 12, 1969.[1]

---

[1] Establishment of a Watershed Improvement District entails several steps. First, a petition proposing the creation of such a district must be filed with the board of supervisors of the soil and water conservation district in which the proposed watershed district will lie. Wyo. Stat. Ann. § 41–354.5. The petition must set forth the boundaries of the proposed district and reasons justifying its creation, and must be signed by a majority of the landowners in the proposed district. *Ibid.*

On receipt of the petition, the board of supervisors must call a public hearing, which "[a]ll owners of land within the proposed

The purposes of the Wyoming Act are "to provide for the prevention and control of erosion, floodwater and sediment damages, and the storage, conservation, development, utilization, and disposal of water." *Id.*, § 41–354.2. These are not purposes related only to special, narrow interests of landowners. As noted in the *Salyer Land Co.* case, flood control is a purpose that affects at least everyone in a watershed district, whether he be owner, lessee, or a resident not engaged in farming, grazing, or other agricultural activity.

In June 1970, appellee sought a right of entry onto lands owned by appellant Associated Enterprises, and leased by appellant Johnston Fuel Liners, for the purpose of carrying out foundation studies for a dam site. When appellant Associated Enterprises resisted, Toltec sought to enforce its right of entry in state court. The trial court agreed with appellants that if Toltec had been illegally formed, they would have a good defense to

watershed improvement district and all other interested parties shall have the right to attend . . . and to be heard." *Id.*, § 41–354.7 (A). The board of supervisors may, after such hearing, determine that there is no need for the creation of the district. If so, the petition is forthwith denied. *Id.*, § 41–354.7 (C).

If the supervisors do think there is a need, however, they must further determine whether the proposed district is "administratively practicable and feasible." *Id.*, § 41–354.8. "To assist the board of supervisors in this determination," a referendum *must* be held in the proposed district "upon the proposition of the creation of such district." *Ibid.* Only owners of land lying within the boundaries of the proposed district may vote in this referendum. *Id.*, § 41–354.9 (B). If a majority of the landowners representing a majority of the acreage within the district do not vote against creation of the district, the board of supervisors is permitted to determine that the district is administratively practicable and feasible, and to declare it created. *Ibid.*

Once created, a watershed improvement district has broad powers. It may exercise the power of eminent domain, levy and collect assessments, and issue bonds. *Id.*, §§ 41–354.13 to 41–354.14.

the asserted right of entry, but held against them on the merits, despite appellants' objections that the referendum which authorized the creation of the watershed improvement district violated the Equal Protection Clause, the franchise being limited to property owners, and the votes being weighted by the amount of property owned. On appeal, the Wyoming Supreme Court affirmed.

I conclude that the presumption set out in *Phoenix* v. *Kolodziejski,* 399 U. S. 204, has not been overcome, for "[p]lacing voting power in property owners alone can be justified only by some overriding interest of those owners that the State is entitled to recognize." *Id.,* at 209. Here, the suggestion was made below that property owners are those "primarily concerned" with the affairs of the watershed district. But assuming, *arguendo,* that a State may, in some circumstances, limit the franchise to that portion of the electorate "primarily affected" by the outcome of an election, *Kramer* v. *Union School District,* 395 U. S. 621, 632, the limitation may only be upheld if it is demonstrated that "all those excluded are in fact substantially less interested or affected than those the [franchise] includes." *Ibid.*

Other than the bald assertion by the court below that it "makes sense" to limit the franchise in watershed district referenda to property owners, there is nothing in the record to support the exclusion. Appellant Johnston is a lessee of land in the District. Why a lessee is "substantially less interested" in the creation of a watershed district than is a titleholder is left to speculation.[2] And

---

[2] The Watershed Improvement District Act itself contemplates that nonlandowners are interested in the proposed creation of a district, by giving them the right to appear and be heard at the public hearing required by the Act prior to the referendum. See n. 1, *supra.* No reason is advanced why a person not owning property can be sufficiently interested in the district to be given a forum, yet is not

mere speculation is insufficient to justify an infringement on the right to vote, a right which is "the essence of a democratic society," *Reynolds* v. *Sims,* 377 U. S. 533, 555.

Moreover, we recently stated that "a percentage reduction of an individual's voting power in proportion to the amount of property he owned would be [constitutionally] defective. See *Stewart* v. *Parish School Board,* 310 F. Supp. 1172 (ED La.), aff'd, 400 U. S. 884 (1970)." *Gordon* v. *Lance,* 403 U. S. 1, 4 n. 1.

## II

It is argued, however, that unlike "units of local government having general governmental powers over the entire geographic area served by the body," *Avery* v. *Midland County,* 390 U. S. 474, 485, a watershed improvement district is "a special-purpose unit of government assigned the performance of functions affecting definable groups of constituents more than other constituents," *id.,* at 483–484. The court below sought to make such an analysis.

The *Avery* test, however, was significantly liberalized in *Hadley* v. *Junior College District,* 397 U. S. 50. At issue was an election for trustees of a special purpose district which ran a junior college. We said,

"[S]ince the trustees can levy and collect taxes, issue bonds with certain restrictions, hire and fire teachers, make contracts, collect fees, supervise and discipline students, pass on petitions to annex school districts, acquire property by condemnation, and in general manage the operations of the junior college, their powers are equivalent, for apportionment purposes, to those exercised by the county commissioners

sufficiently interested to be allowed to implement the views he expresses at that forum through the ballot box.

in *Avery*. . . . [T]hese powers, while not fully as broad as those of the Midland County Commissioners, certainly show that the trustees *perform important governmental functions* . . . and have *sufficient impact throughout the district* to justify the conclusion that the principle which we applied in *Avery* should also be applied here." *Id.,* at 53–54. (Emphasis added, footnote omitted.)

Measured by the *Hadley* test, the Toltec Watershed Improvement District surely performs "important governmental functions" which "have sufficient impact throughout the district" to justify the application of the *Avery* principle. The District may: levy and collect special assessments, Wyo. Stat. Ann. § 41–354.13 (A); acquire and dispose of property, § 41–354.13 (B); exercise the power of eminent domain, § 41–354.13 (C); and borrow money and issue bonds, § 41–354.13 (E)—all to exercise flood control. § 41–354.2.

The lower court characterized these functions as "proprietary" in nature, rather than "governmental." But that is a meaningless distinction when control of public affairs is at issue. *Cipriano* v. *City of Houma,* 395 U. S. 701; *Stewart* v. *Parish School Board of St. Charles,* 310 F. Supp. 1172, 1176, aff'd, 400 U. S. 884. It is hardly to be argued that a public body with the power to take land by eminent domain, to issue bonds, to levy taxes, and to provide plans for flood control does not "perform important governmental functions."

It is also inconceivable that a body with the power to destroy a river by damming it and so deprive a watershed of one of its salient environmental assets does not have "sufficient impact" on the interests of people generally to invoke the principles of *Avery* and *Hadley*.

It is said that there is a difference between an election to create a special-purpose district, and an election either

to authorize the district to issue bonds, or to elect district officers. In my view, such a distinction is not tenable.

> "Our exacting examination [of statutes which selectively distribute the franchise] is not necessitated by the subject of the election; rather, it is required because some resident citizens are permitted to participate and some are not." *Kramer* v. *Union School District, supra,* at 629.

As we said in *Hadley:*

> "If the purpose of a particular election were to be the determining factor in deciding whether voters are entitled to equal voting power, courts would be faced with the difficult job of distinguishing between various elections. We cannot readily perceive judicially manageable standards to aid in such a task. It might be suggested that equal apportionment is required only in 'important' elections, but good judgment and common sense tell us that what might be a vital election to one voter might well be a routine one to another." 397 U. S., at 55.

The mere creation of the Watershed Improvement District subjects residents of the area to constraints. The District may condemn land without further electoral approval; and it has the power to finance improvements through special taxes levied against land to be benefited by the improvements without further electoral approval. While such assessments fall in the first instance on the landowner, lessees and tenants would be substantially affected, as well.[3] And its power to reshape or control the watershed and to provide flood control enables it to

---

[3] Landowners are often able to pass property taxes through to their lessees and tenants. D. Netzer, Economics of the Property Tax (1966). This is especially true in urban areas where the demand for rental housing is price inelastic, but there is no reason why it may not also be true in rural areas, as well.

turn rivers into flumes or to destroy them by erecting dams to build reservoirs. Dams may be vital or they may be disastrous. The sedimentation rate in some areas is so fast as to reduce the life of dams to a few decades. Dams may destroy valued fish runs. Dams substitute a reservoir for a river and wipe out the varied life of a river course, including its wildlife, canoe waters, camping and picnic grounds, and nesting areas of birds. This reshaping of the face of the Nation may be disastrous, no matter who casts the ballots. The enormity of the violation of our environmental ethics, represented by state and federal laws, is only increased when the ballot is restricted to or heavily weighted on behalf of the few who are important only because they are wealthy.

The issues I tender are disposed of by the suggestions that the members of the Legislature of Wyoming passed the Act now challenged, that they represented the people of Wyoming, and that they could therefore put the landowners in command of the environmental problems tendered by this case. That would, of course, be true if the case presented no federal question. But adherence to *Reynolds* v. *Sims* and its progeny makes the federal rule dominant, *viz.*, that important governmental functions may not be assigned to special groups, whether powerful lobbies or other discrete groups to which a state legislature is often beholden.

I would reverse the judgment below.