**In re EXTENSION OF BOUNDARIES OF GLAIZE CREEK SEWER DISTRICT OF JEFFERSON COUNTY.**

No. 60186.

Supreme Court of Missouri, En Banc.

Dec. 18, 1978.

John W. Howald, Jeremiah Nixon, Hillsboro, for appellant.

Benson Cytron, House Springs, for respondent.

MORGAN, Chief Justice.

This case involves the constitutionality of Section 249.807, RSMo 1969. That statute provides for extension of the boundaries of a sewer district found under Sections 249.-760 to 249.810, RSMo 1969, provided the proposition must be voted on affirmatively by the owners of two-thirds of the property in the area to be annexed, on the basis of assessed valuation, and by two-thirds of the owners of the property in the original district, again on the basis of assessed valuation. Appeal (by the District) has been taken from an order of the circuit court holding said statute violative of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and Article I, § 2 of the Missouri Constitution because it creates an arbitrary and unreasonable voting classification. Because the cause involves the construction of the Missouri and United States Constitutions, this court has jurisdiction of the appeal.

The facts are not in issue, but a brief review is necessary before the constitutional claim can be approached.

The Glaize Creek Sewer District of Jefferson County, Missouri, by its Board of Supervisors and five or more owners of real estate within the territory to be annexed, filed in the Circuit Court of Jefferson County, Missouri an action titled *In Re: Extension of Boundaries of Glaize Creek Sewer District of Jefferson County, Missouri.* This was done pursuant to the provisions of § 249.807, RSMo 1969, which reads as follows:

249.807. Extension of boundaries of district, procedure

1. The boundaries of any sewer district formed under the provisions of sections 249.760 to 249.810 may be extended from time to time by filing a petition with the clerk of the circuit court having jurisdiction, signed by the board of supervisors and five or more owners of real estate situated within the territory to be annexed. The same proceeding shall then be followed as provided in sections 249.760 to 249.810 for the original organization of the district *except that the proposition must be voted on affirmatively by the owners of two-thirds of the property in the area to be annexed, on the basis of assessed valuation, and by two-thirds of the owners of the property in the original district, on the basis of assessed valuation, in order to be conclusive.*

2. The costs incurred in the extension of the boundaries of the district shall be taxed to the district if the annexation is completed and otherwise against the petitioners, except that no costs shall be taxed to the board of supervisors.

3. Any owner of real estate that abuts upon a district once formed may petition the board of supervisors for the incorporation of the real estate in the district. If approval is granted by the board the clerk of the board shall indorse his certificate of the fact of approval by the board upon the petition. The petition shall then be filed with the clerk of the circuit court of the county in which the district is incorporated. It is then the duty of the court to amend the boundaries of the district by a decree incorporating the real estate in it. A certified copy of the decree shall then be filed in the office of the recorder and in the office of the county clerk of the county in which the real estate is located, and in the office of the secretary of state. The costs of the proceeding shall be borne, by the petitioning property owners. (L.1961 p. 451 § 20). (Emphasis added).

The petition alleged that the extension would be necessary in order to correct individual collection and treatment facilities in the area sought to be annexed which were alleged to be inadequate and inconsistent with good public health practices and pollution laws.

The petition set forth the boundary lines of the existing district and of the territory to be annexed; the names of all owners of real estate in the territory to be annexed; the names of all property owners in the existing district; and the legal description of the "out" boundary as it would exist after approval of the annexation. The petition prayed that the court incorporate the area sought to be incorporated with the boundaries of the existing district.

The petition and exhibits accompanying same were duly filed, all pursuant to the statute, and the clerk then caused public notice of the annexation and caused legal notice to be published in a local newspaper.

On May 6, 1977, a document designated as an objection to Extension of Boundaries of Glaize Creek Sewer District was filed in the circuit court by owners of real property within the boundaries of the area sought to be annexed. The document contained an objection to the annexation and extension of boundaries, denied the allegations in the petition and raised the affirmative point that the provisions of § 249.760 to § 249.807, RSMo 1969, denied the objectors their constitutional rights, as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, § 2 of the Missouri Constitution, in particular their right to equal protection under the law.

The equal protection violation was alleged in that only persons who own real estate are entitled to vote in the election provided for in § 249.807, with such votes weighed and granted according to assessed valuation. Such provisions were alleged to be unreasonable, discriminatory and an arbitrary classification in violation of the rights guaranteed those who signed the document.

Based upon the arguments of counsel, the circuit court entered an order that § 249.-807, RSMo 1969, as pertaining to annexation, is unconstitutional and violative of both the state and federal constitutions in its creation of an arbitrary and unreasonable voting classification.

The primary issue herein involved is whether the statute does create an arbitrary and unreasonable voting classification, thereby violating the equal protection rights guaranteed in the state and federal constitutions.

Appellant, in its brief, argued that the trial court erred in dismissing the petition because the respondents lacked standing to challenge § 249.807, due to the fact that respondents are property owners, and have not been denied a vote. However, in oral argument appellant stated that both parties would be better served if this court decided this cause on the merit of the constitutional issue involving equal protection. We accede to appellant's urging, and put aside what we regard as a serious standing problem, in order to decide the constitutionality of § 249.807.

Appellant notes initially that the extension of boundaries or the annexation of territory by a political subdivision or municipal corporation has long been held to be a plenary power of the state legislature, and subject only to constitutional limitation, the legislature possesses the power to annex, or authorize the annexation of territory to an existing governmental unit, with or without the consent or even against the remonstrance of the persons residing therein. *Hunter v. Pittsburgh,* 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907); *Barnes v. Kansas City,* 359 Mo. 519, 222 S.W.2d 756 (banc 1949).

However, in the instant case, the legislature chose to provide for consent of property owners as a condition precedent to annexation. Therefore, while there may be no constitutional right to anyone to vote in the organization or enlargement of a municipal corporation (and by analogy a sewer district), the legislature has granted such a right. The problem here is not deprivation of a constitutional right to vote, but rather, as respondents correctly point out, whether or not, in granting a right to vote, the legislature created an arbitrary classification such as would violate the Fourteenth Amendment to the United States Constitution and Article I, Sec. 2 of the Missouri Constitution, both of which guarantee equal protection under the law. Appellant con-

tends such an exercise of legislative discretion as is evidenced by § 249.807 is totally reasonable and valid. Respondents argue it is not. The task at hand would appear to be clear.

> . . . if a challenged state statute grants the right to vote in a limited purpose election to some otherwise qualified voters and denied it to others, "the Court must determine whether the exclusions are necessary to promote a compelling state interest." *Kramer v. Union Free School District No. 15,* 395 U.S. 621, 627, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1968) . .

Moreover, no less showing that the exclusions are necessary to promote a compelling state interest is required merely because "the questions scheduled for the election need not have been submitted to the voters." *Cipriano v. City of Houma,* 395 U.S. 701, 704, 89 S.Ct. 1897, 1899, 23 L.Ed.2d 647 (1968).

■ Thus, we may begin with the premise that a compelling state interest must be demonstrable in order to justify the exclusion involved in this election scheme. As pointed out in *Kramer v. Union Free School District No. 15,* 395 U.S. 621, 627–28, 89 S.Ct. 1886, 1890, 23 L.Ed.2d 583 (1968):

> . . . when we are reviewing statutes which deny some residents the right to vote, the general presumption of constitutionality afforded state statutes and the traditional approval given state classifications if the Court can conceive of a "rational basis" for the distinctions made are not applicable.

For that reason, in *Kramer,* such voting provisions were closely scrutinized. In that case, a New York statute limiting the franchise in school board elections to owners and lessees of real property and to parents of school age children was struck down as violative of the Equal Protection Clause of the Fourteenth Amendment. Besides demonstrating a rational basis for the exclusions involved, the state was made to bear the burden of proving those exclusions were "necessary to promote a compelling state interest." 395 U.S. at 630, 89 S.Ct. at 1891.

In *Cipriano v. City of Houma,* 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1960) and *Phoenix v. Kolodziejski,* 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970) the Supreme Court examined bond elections and in both cases a state law excluding nonproperty owners from voting lacked a justification that reached the point of a compelling state interest.

In *Cipriano,* supra, the denial of the franchise to nonproperty owners in elections on revenue bonds was held to be violative of the nonproperty owners' rights because they, like property owners, would be substantially affected by the issuance of revenue bonds to finance municipal utilities.

In *Phoenix,* supra, the same court held that the case of elections to approve general obligation bonds was analogous and a similar voting scheme was prohibited under the Fourteenth Amendment. The court stated that:

> . . . The differences between the interests of property owners and the interests of nonproperty owners are not sufficiently substantial to justify excluding the latter from the franchise. . . .
>
> . . . it is unquestioned that all residents of Phoenix, property owners and nonproperty owners alike, have a substantial interest in the public facilities and the services available in the city and will be substantially affected by the ultimate outcome of the bond election at issue in this case. Presumptively, when all citizens are affected in important ways by a governmental decision subject to a referendum, the Constitution does not permit weighted voting or the exclusion of otherwise qualified citizens from the franchise. *Phoenix v. Kolodziejski,* 399 U.S. 204, 209, 90 S.Ct. 1990, 1994, 26 L.Ed.2d 523 (1969).

*Cipriano, Phoenix* and *Kramer* provide the starting place for resolution of this case. Clearly, they establish the rule and the test for exclusionary voting schemes and weighted voting shares. See also *Hadley v. Junior College District,* 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970) (holding that the

one person, one vote rule applies to school district trustee elections).

The difficult cases which we reach, and the point of real demarcation for the parties here, are *Salyer Land Co. et al. v. Tulare Lake Basin Water Storage District*, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973) and *Associated Enterprises, Inc., et al. v. Toltec Watershed Improvement District*, 410 U.S. 743, 93 S.Ct. 1237, 35 L.Ed.2d 675 (1973).

Those cases create an exception to the general equal protection prohibition against exclusionary and weighted voting. The question we now have is whether or not the instant case falls within that exception.

In *Salyer,* the Supreme Court reviewed a constitutional challenge to the organization of a water storage district, pursuant to the California Water Storage District Act, Calif.Water Code § 39000 et seq. Such a district was authorized to plan projects and execute approved projects for the acquisition, appropriation, diversion, storage, conservation and distribution of water in California. The districts could also acquire and operate any necessary works for storing and distributing water and fix tolls and charges for the use of water, collecting them from all persons receiving the benefit thereof. The costs of the projects were to be assessed against district land in accordance with the benefits accruing to that land. Each district was to be governed by a board of directors elected from within the division and it was the voter qualification scheme for such elections that prompted the constitutional challenge. Therein, the voting plan permitted only landowners to vote in water storage district general elections with such votes being apportioned according to assessed valuation of the land. The voting provision was upheld as constitutional by the United States Supreme Court.

In doing so, the court carefully reviewed the cases preceding *Salyer*. *Kramer*'s voter qualification statute for school district elections was found to have been deficient because it ". . . excluded many persons who had distinct and direct interests in school meeting decisions and included many persons who had, at best, remote and indirect interests." 410 U.S. at 726, 93 S.Ct. at 1229.

The Louisiana law which gave only property taxpayers the right to vote in elections called to approve the issuance of revenue bonds by a municipal utility in *Cipriano,* was said to have been constitutionally infirm:

. . . since the operation of the utility system affected virtually every resident of the city, not just the 40% of the registered voters who were also property taxpayers, and since the bonds were not in any way financed by property tax revenue. 410 U.S. at 727, 93 S.Ct. at 1229.

The court said it had expanded that rationale in *Phoenix* to include general obligation bonds of municipalities because "It was there noted that not only did those persons excluded from voting have a great interest in approving or disapproving municipal improvements, but they also contributed both directly through local taxes and indirectly through increased rents and costs to the servicing of the bonds." Id. at 727, 93 S.Ct. at 1229.

The court did note its pronounced exception to the one person, one vote rule, articulated in *Kramer* and in *Hadley v. Junior College District,* supra:

It is of course possible that there might be some case in which a State elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately affect different groups that a popular election . . . might not be required, . . *Hadley v. Junior College District,* 397 U.S. 50, 56, 90 S.Ct. 795 (1970).

In *Salyer,* the court then stated: "We conclude that the appell[ate] water storage district, by reason of its special limited purpose and of the disproportionate effect of its activities on landowners as a group, is the sort of exception to the rule . . . ." 410 U.S. at 728, 93 S.Ct. at 1229.

That holding was based upon two reasons: First, the fact that the district did not exercise what the court referred to as any

normal governmental authority, but rather, had only a relatively limited authority. The court stated: "Its primary purpose, indeed the reason for its existence, is to provide for the acquisition, storage, and distribution of water for farming in the Tulare Lake Basin. It provides no other general public services such as schools, housing, transportation, utilities, roads, or anything else of the type ordinarily financed by a municipal body. There are no towns, hospitals, or other facilities designed to improve the quality of life within the district boundaries, and it does not have a fire department, police, buses, or trains." 410 U.S. at 728–29, 93 S.Ct. at 1230. Secondly, stated the court: "[The district's] actions disproportionately affect landowners. All of the costs of district projects are assessed against land by assessors in proportion to the benefits received. Likewise, charges for services rendered are collectible from persons receiving their benefit in proportion to the services. When such persons are delinquent in payment, just as in the case of delinquency in payments of assessments, such charges become a lien on the land. In short, there is no way that the economic burdens of district operations can fall on residents *qua* residents, and the operations of the districts primarily affect the land within their boundaries." 410 U.S. at 729, 93 S.Ct. at 1230.

By reason of (1) the special limited purpose and (2) the "disproportionate effect of its activities on landowners as a group," the court found the district did fit the exception to the one man, one vote rule. 410 U.S. 728, 93 S.Ct. 1229. In this type of special purpose district, added the court, the question for determination is not whether there is a compelling state interest in such a scheme as the election in issue, but rather whether the decision to deny the franchise to nonlandowners may be reasonably justified by any state of facts. In other words, if the two exception qualifications are met, a challenged election need only meet a minimum rational basis scrutiny (could the leg-

islature have reasonably believed preferential voting was necessary?).

The court reasoned that the California legislature could reasonably have concluded that a statutory framework for election of directors should focus on the land benefitted rather than on the people as such. 410 U.S. at 729–30, 93 S.Ct. 1224. The less rigid "rational basis" test led to the following conclusion:

. . . The California Legislature could quite reasonably have concluded that the number of landowners and owners of sufficient amounts of acreage whose consent was necessary to organize the district would not have subjected their land to the lien of its possibly very substantial assessments unless they had a dominant voice in its control. Since the subjection of the owners' lands to such liens was the basis by which the district was to obtain financing, the proposed district had as a practical matter to attract landowner support. Nor, since assessments against landowners were to be the sole means by which the expenses of the district were to be paid, could it be said to be unfair or inequitable to repose the franchise in landowners but not residents. Landowners as a class were to bear the entire burden of the district's costs, and the State could rationally conclude that they, to the exclusion of residents, should be charged with responsibility for its operation. We conclude, therefore, that nothing in the Equal Protection Clause precluded California from limiting the voting for directors of appellee district by totally excluding those who merely reside within the district. 410 U.S. at 731, 93 S.Ct. at 1231.[1]

The question now before this court is whether the instant factual situation falls within the exception carved out by the *Salyer* case. We do not believe that it does. We believe this case falls within the consistent body of case law that holds that in order to justify denying the franchise to a

---

1. The court found a rational basis for an identical statutory scheme in *Associated Enterprises, Inc., et al. v. Toltec Watershed Improvement*

*District,* 410 U.S. 743, 93 S.Ct. 1237, 35 L.Ed.2d 675 (1973), a per curiam case accompanying *Salyer.*

group of voters, the exclusion must be premised upon some compelling state interest.

■ If all voters have an interest in adequate service and the rate structure of a utility district (*Cipriano,* supra) or in school affairs (*Kramer,* supra) or in a library (*Hill v. Stone,* 421 U.S. 289, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975)), then they also have an interest in the adequacy and rate structure of a sewer district.

In *Salyer,* the court distinguished the water storage district from the above because it did not provide any ". . . general public services . . . ." 410 U.S. at 728–29, 93 S.Ct. 1224. In the instant case the district would certainly provide a crucial public service, one of benefit to the health and well being of all residents and not just to landowners.

Further, in dealing with the second test set out in *Salyer,* we do not find a potential disproportionate effect on landowners by the actions of a sewer district. In the instant case, assessments against land are not the sole method of financing the district. The district may and probably will charge all users, nonproperty owners as well as property owners. Further, sewer service to all nonpayers can easily and quickly be cut off to ensure rate payment, corresponding to any ad valorem tax levy becoming a lien on the property of a landowner *for nonpayment* of costs assessed by way of taxes. § 249.785. Moreover, the district may issue revenue bonds payable from revenue derived from operation of the district's sewage system other than assessments.

Beyond all this, we see *Salyer* as a distinct exception to the line of cases pertaining to this issue. The water district there was primarily geared to acquire, store and distribute water for farming in a drought ridden area. Assessments against the land were the principal means of financing the district. In the instant case, a public benefit, a sewage system, is financeable by a variety of methods, many of which, like the benefit itself, affect *all those residing in the district.*

■ For these reasons we do not find that this district falls within the special purpose exception of *Salyer* and we require a compelling state interest to justify the arbitrary disenfranchisement of nonproperty owning voters. Appellant suggests no such compelling state interest, nor in view of the above discussion, can we discern such an interest. Appellant alludes to administrative difficulty in allowing any but property owners the franchise. Appellant also suggests that only property owners would be willing to take a genuine interest and concern in the sewer district. We regard both of these arguments as a sophistic exercise and find no reason that would compel the state to make this arbitrary and unreasonable distinction in granting the voting franchise.

In reaching this conclusion, we find we are in accord with those jurisdictions that have sought to interpret and apply the Supreme Court's rulings in this area of constitutional law.

For example, in *Choudhry et al. v. Free,* 17 Cal.3d 660, 131 Cal.Rptr. 654, 552 P.2d 438 (1976), the Supreme Court of California discussed the unbroken line of United States Supreme Court cases striking down statutes requiring property qualifications for voting in special purpose districts. The California Court recognized *Salyer* as the only recent decision providing an exception to the trend, and distinguished *Salyer's* exception from the district in question on the basis that the instant special purpose district furnished services to residents who were not property owners and also on the basis that assessments against land were *not* the only means of paying the district's expenses. 552 P.2d at 443. In doing so, the court struck down a statute providing that the director of an irrigation district must be a freeholder of the district he would represent.

In *Kelley v. Mayor and Council of City of Dover,* 314 A.2d 208 (Del.Ch.1973) a constitutional challenge was directed at a Delaware statute providing for annexation elections with weighted voting on the basis of property ownership. The Delaware Su-

preme Court found such a scheme violated the Equal Protection Clause, distinguishing *Salyer,* because the district in Delaware provided more general services than did the district in *Salyer.*

In *Wright v. Town Board of Carlton,* 70 Misc.2d 1, 332 N.Y.S.2d 233, aff'd as mod. on other ground, 41 A.D.2d 290, 342 N.Y. S.2d 577, aff'd Mem., 33 N.Y.S.2d 977, 353 N.Y.S.2d 739, 309 N.E.2d 137 (1973), a provision limiting voting rights in the organization of a water district to owners of taxable real property was held violative of the Equal Protection Clause.

We do note that some jurisdictions have dealt with special purpose districts that do fit the two-pronged exception test articulated in *Salyer,* and we certainly recognize that such exceptions may exist,[2] though they are not applicable under the facts of the instant case.

Again, we find that the appellant sewer district does not meet the two-part test of the *Salyer* exception, nor do we then find any compelling state interest in the voting scheme contested here. Thus, we find § 249.807, providing for the election, is unconstitutional as violative of both the United States and Missouri Constitutions.

■ In finding that the § 249.807, RSMo 1969 is unconstitutional as it pertains to annexation of sewer districts on the basis that it creates an arbitrary and unreasonable voting classification, we affirm the order of the circuit court below dismissing with prejudice the petition for the extension of boundaries in the Glaize Creek Sewer District.

Appellant would have us remand with instructions to require the Board of Supervisors to hold a popular election to approve appellant's petition in order to effectuate the legislative intent of § 249.777.2, which appellant claims allows the Board of Supervisors of a district to require a popular vote if "required by law." We decline to embark on such a course in view of the fact that the issue before us is solely related to the constitutionality of § 249.807. We do state, however, that any future elections of the type herein contested, should, of necessity, fit the guidelines suggested by the United States Supreme Court.

Annexation elections similar to that contested here today which have already occurred in this state are not to be held retrospectively void by virtue of this decision. Such retrospective application would produce substantial hardships and inequitable results and there is ample basis for avoiding such injustice.

■ In *Abernathy v. Sisters of St. Mary's,* 446 S.W.2d 559, 606 (Mo.1969), we were "cognizant of the fact that retrospective application of our decision could result in great hardship to those institutions which have relied on our prior decisions upholding the doctrine of charitable immunity. Therefore, feeling that justice will best be served by prospective application of the decision announced today, we hold that the new rule shall apply to this case and to all future causes of action . . . ." Such a prospective application is also necessary in the present case to avoid injustice to those

2. See, e. g., *Chesser v. Buchanan,* 568 P.2d 39 (Colo.1977) (Tunnel improvement district requirement that residents have paid real property taxes before they can vote for district commissioners held within *Salyer* exception because of the limited scope of the district, the lack of any ordinary government services rendered and the fact that deficits in nonpayment could only result in assessments against landowners, with assessments being a lien on the land and with no provision for service charges of any kind); *Citizens To Save Our Land v. McKee Creek Watershed Conservancy District of Adams et al., Counties,* 37 Ill.App.3d 935, 347 N.E.2d 41 (1975) (Act providing for appointment rather than election of trustees of

river conservancy district held within *Salyer* exception because the activities of the district had no influence on the citizenry generally but merely affected a special group of citizens); *Humane Society of United States, New Jersey Branch, Inc. v. New Jersey State Fish & Game Council,* 129 N.J.Super. 239, 322 A.2d 841, rev'd on other grounds 70 N.J. 565, 362 A.2d 20 (1976) appeal dismissed, 429 U.S. 1032, 97 S.Ct. 723, 50 L.Ed.2d 744 (1977) (Statute limiting appointment to Fish and Game Commission to farmers, sportsmen and commercial fisheries held within *Salyer* exception because of specialized subject matter not within normal governmental services).

citizens who have relied on the outcome of elections already past. As the California Supreme Court noted in *Westbrook et al. v. Mihaly*, 2 Cal.3d 765, 87 Cal.Rptr. 839, 865, 471 P.2d 487, 513 (1970), ". . . we find ample authority for our refusal to disturb the results of an election conducted under ground rules later held invalid . . . and for our decision to limit the retroactive effect of judicial intervention in the bond election process." In an election case, the United States Supreme Court in *Cipriano v. City of Houma*, 395 U.S. 701, 706, 89 S.Ct. 1897, 1900, 23 L.Ed.2d 647 (1960), found that: "Significant hardships would be imposed on cities, bondholders, and others connected with municipal utilities if our decision today were given full retroactive effect. Where a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity." See also: *Kelley v. Mayor and Council of City of Dover*, 314 A.2d 208, 216 (Del.Ch.1973).

To avoid the injustice and hardship that would inevitably result from a retroactive decision applied to all similar elections, we invalidate only the election in issue in the present case and hold this decision applicable to all future such elections.

The order of the circuit court dismissing the petition for the extension of boundaries is hereby affirmed.

BARDGETT, FINCH, RENDLEN and SEILER, JJ., and GUNN, Special Judge, concur.

DONNELLY, J., dissents.

SIMEONE, J., not participating because not a member of the Court when cause was submitted.