Matt JOHNSTON, Mike Johnston, Associated Enterprises, Inc., a Wyoming Corporation, and Bard Ranch Company, a Wyoming Corporation, Plaintiffs,

v.

R. M. DAVIS, Administrator of the Soil Conservation Service, United States Department of Agriculture, James Mitchell, Administrator for Watersheds of the Soil Conservation Service, United States Department of Agriculture, Frank Dixon, Soil Conservation Service State Conservationist for the State of Wyoming, United States Department of Agriculture, Ronnie Clark, Assistant State Conservationist for Water Resources for State of Wyoming, Soil Conservation Service, United States Department of Agriculture, Robert Berguland, Secretary of United States Department of Agriculture, Gordon Cavanaugh, Administrator, Farmers Home Administration, United States Department of Agriculture, Clyde Teague, Chief of Community Programs and Business and Industry for Farmers Home Administration Office in Wyoming, United States Department of Agriculture, Honorable Robert A. Hill, District Judge of the Second Judicial District of the State of Wyoming, Defendants,

Toltec Watershed Improvement District, Intervenor.

No. C78–173B.

United States District Court, D. Wyoming.

Nov. 3, 1980.

# 1324

Henry A. Burgess and Kim D. Cannon, Burgess & Davis, Sheridan, Wyo., for plaintiffs.

Charles E. Graves, U.S. Atty., Dist. of Wyoming, Cheyenne, Wyo., for defendants.

## MEMORANDUM OPINION AND JUDGMENT

BRIMMER, District Judge.

This action was originally brought by the Plaintiffs, Matt Johnston, Mike Johnston, Associated Enterprises, Inc., a Wyoming corporation, and Bard Ranch Company, a Wyoming corporation, by their attorneys, Henry A. Burgess, Esq. and Kim D. Cannon, Esq., seeking to enjoin the Defendants, R. M. Davis, as Administrator of the Soil Conservation Service of the United States Department of Agriculture, James Mitchell as Administrator for Watersheds of the Soil Conservation Service, Frank Dixon as State

Conservationist of the Soil Conservation Service, Ronnie Clark as Assistant State Conservationist of Water Resources for Wyoming Soil Conservation Service, and the Secretary of Agriculture, Administrator of the Farmers Home Administration, and the Chief of Community Programs and Business and Industry in Wyoming, of the Farmers Home Administration, called the "federal defendants" herein and represented by Charles E. Graves, Esq., United States Attorney for Wyoming, from committing federal funds for construction of the Toltec Reservoir or the taking of lands for its construction until an environmental impact statement (EIS) had been prepared and filed. The Court in 1978 required such an environmental impact statement to be prepared. When it was filed February 28, 1980, the federal defendants counterclaimed for a declaratory judgment approving its sufficiency and the declaring that the administrative procedures approving the Toltec Reservoir Project pursuant to the work plan under alternative (a) of the EIS is a reasonable exercise of administrative discretion. The Plaintiffs contend that the final EIS is not in compliance with the requirements of the National Environmental Policy Act (NEPA), principally because the Soil Conservation Service erred in its evaluation of the cost–benefit ratio of the project by using an interest rate of 3¼% in determining that ratio, and because there were no "satisfactory assurances" made in 1969 by the Toltec Watershed Improvement District, which has intervened in the case and represented by Fred W. Phifer, Esq., sufficient to justify that 3¼% interest rate.

This case is the latest effort of the plaintiffs, in a long history of litigation covering more than ten years and in which the parties have been once to the United States Supreme Court,[1] twice to the Wyoming Supreme Court,[2] and still have another case, a condemnation action, pending in the Wyoming State Court.[3] The first case, started

1. *Associated Enterprises, et al. v. Toltec Watershed Imp. Dist.*, 410 U.S. 743, 35 L.Ed.2d 675, 93 S.Ct. 1237 (1973).

2. *Associated Enterprises Inc. v. Toltec Watershed Imp. Dist.*, 578 P.2d 1359 (Wyo. 1978).

*Associated Enterprises Inc. v. Toltec Watershed Imp. Dist.*, 490 P.2d 1069 (Wyo. 1971).

3. *Toltec Watershed Improvement Dist. v. Associated Enterprises, et al., Dist.Ct., Albany Cty.,* Wyo., Civil No. 16166.

in 1970, sought a judgment preventing entry upon plaintiffs' ranch lands upon the ground that the Wyoming statutes creating watershed improvement districts were unconstitutional for offending the "one man, one vote" concept of equal protection under the Wyoming and United States Constitutions. The Wyoming Supreme Court in 1971 and the United States Supreme Court in 1973 held that there was no denial of equal protection. The next case, started in 1974 and decided in 1978, denied relief to the plaintiffs who sought to attack the reservoir storage permit of the improvement district which had been extended by the Wyoming State Engineer because litigation had unavoidably delayed construction and completion of the Toltec Reservoir. The Wyoming Supreme Court held that such litigation constituted good cause for the State Engineer's extension of time for construction of the reservoir. That opinion indicates that the condemnation action has been pending in the District Court of Albany County, Wyoming since October 1, 1974. A hearing on the necessity for the condemnation was held in February 1978 but no order was entered, and by mutual agreement of this Court and the Honorable Robert A. Hill, District Judge to whom that case was assigned, no action would be taken therein during the pendency of this action.

The Toltec Reservoir Project was proposed under Public Law 83-566, as amended (16 U.S.C. §§ 1001-1008), the Watershed Protection and Flood Prevention Act, by a group of landowners who live in the area of the reservoir in Albany County, Wyoming and have organized the Toltec Watershed Improvement District to act as sponsor of the project.

The reservoir project, for storage of 2352 acre feet of water on the North Laramie River, near Garrett, Wyoming, is expected to change 136 acres of irrigated land and 259 acres of rangeland to reservoir, dam, roads, and recreation facilities. (EIS Figure 1, Alternative A). The land to be acquired for the proposed reservoir is presently owned by Plaintiff, Associated Enterprises. In the project area, the streams primarily carry spring runoff, which passes through the area between mid-March and mid-May. If the ranchers want to have water for the summer and fall, they need to develop late storage by construction of a reservoir, and this natural reservoir site is the area's only possible site. (Defendants' Exhibit B). The original reservoir permit from the State Engineer was granted. The EIS states that of 4800 acres of pasture and hayland in the watershed, only 500 acres have a full water supply and the remaining 4300 acres have only 15% of the needed supply.

Although there was a 1912 reservoir permit filing on the site, nothing much was done toward constructing it until 1957 or two or three years thereafter when Glen Dunlap and Merlin Robbins, two of the ranchers in the area, started working to build it. Their efforts included making a filing of their own in 1959 and hiring their own surveyor, but as time went on, they felt the project was too big for them and they asked the Soil Conservation Service to help them (Tr. pp. 48-55). That agency prepared a Watershed Work Plan, dated October 1967, under the authority of the Watershed Protection & Flood Prevention Act (P.L. 566, 83d Cong., 68 Stat. 666), which was authorized on January 26, 1968 and signed by the Laramie River Soil and Water Conservation District on January 26, 1968, by the Toltec Watershed Improvement District on January 25, 1968, and by the Soil Conservation Service on May 26, 1968. That plan proposed construction of a multi-purpose reservoir, water measurement structure and recreation facilities at an installed cost of $643,000.00, with a cost-benefit ratio of 1.6:1.0, for supplemental irrigation water for 1745 acres of cropland, recreation, full utilization of water supplies and flood protection (Plaintiffs' Ex. 1). The Toltec Watershed Improvement District was first organized on January 18, 1968 by the ranchers of the area, except for the Plaintiffs. The referendum of January 26, 1970 (Plaintiffs' Ex. 16) on the proposal to issue bonds for the acquisition of land and construction of the Toltec Reservoir indicates that in that sparsely settled area of Wyoming, there were 6 ranchers with 6040 acres for the proposal and one, pre-

sumably the Plaintiffs, with 1040 acres against it. The minutes (Defendants' Ex. Y) indicate that the ranchers interested in the project have numbered between 6 and 8 and constituted a majority of the landowners in the district. It was necessary to reorganize the district in 1969 because of legal disputes in its initial organization, which was done with the petition for its reorganization in February, 1969 (Defendants' Ex. G) and loan applications were submitted for project funding by the Soil Conservation Service and the Farmers Home Administration. The Board of Supervisors of the Laramie Rivers Soil and Water Conservation District, on May 14, 1969 certified to the County Clerk and Secretary of State, pursuant to Section 41–8–110, W.S. 1977 that the Toltec Watershed Improvement District had been created, after a referendum held May 12, 1969, and on December 16, 1969 approved a resolution for a referendum, or issuance of bonds for construction, pursuant to §§ 41–8–114 and 41–8–110, W.S. 1977, notice was posted and published, and was approved by the landowners of the district on January 5, 1970. The State Engineer of Wyoming approved the transfer of the reservoir permit to the district on December 15, 1969, and did not approve a "top filing" on the reservoir site by Associated Enterprises, one of the corporate plaintiffs. The district was notified that the Project Work Plan was approved by the House Public Works Committee July 18, 1968 and by the Senate Public Works Committee September 12, 1968 (Defendants' Ex. D), which held a hearing on that date, in which the project was opposed on behalf of the corporate plaintiffs, Associated Enterprises, and by letter of April 14, 1969 the SCS State Conservationist advised the district that the project had been approved for operations (Defendants' Ex. G). However, the Acting Administrator of the Soil Conservation Service had signed and approved the Work Plan on May 28, 1968 (Plaintiffs' Ex. 1).

The Soil Conservation Service, in interpreting its policy, stated in its National Economics Bulletin No. 39–9–4, December 5, 1970, which purports to establish procedures regarding interest rates to be issued in evaluating federally assisted water projects (Defendants' Ex. F), said that the interest rate of 3¼% should be used for plans approved prior to October 14, 1968, and that, "The approval date to be used in determining the applicable interest rate is the date the administrator or the State Conservationist signed the original plan or agreement" (Defendants' Ex. F, p. 2). For that reason a rate of 3¼% was used in the EIS to determine the cost–benefit ratio (Tr., pp. 115–116).

The SCS policy is consistent with 42 U.S. C.A. § 1962d–17 (Section 80(a) and (b) of Public Law 93–251, The Act of March 7, 1974, 88 Stat. 34) which provides:

"(a) The interest rate formula to be used in plan formulation and evaluation for discounting future benefits and computing costs by Federal officers, employees, departments, agencies, and instrumentalities in the preparation of comprehensive regional or river basin plans and the formulation and evaluation of Federal water and related land resources projects shall be the formula set forth in the 'Policies, Standards, and Procedures in the Formulation, Evaluation, and Review of Plans for Use and Development of Water and Related Land Resources' approved by the President on May 15, 1962, and published as Senate Document 97 of the Eighty–seventh Congress on May 29, 1962, as amended by the regulation issued by the Water Resources Council and published in the Federal Register on December 24, 1968 (33 F.R. 19170; 18 C.F.R. 704.39), until otherwise provided by a statute enacted after the date of enactment of this Act. Every provision of law and every administrative action in conflict with this section is hereby repealed to the extent of such conflict."

"(b) *In the case of any project authorized before January 3, 1969, if the appropriate non–Federal interests have, prior to December 31, 1969, given satisfactory assurances to pay the required non–Federal share of project costs,* the discount rate to be used in the computation of benefits and costs for such project shall be the rate in effect immediately prior to

December 24, 1968, and that rate shall continue to be used for such project until construction has been completed, unless otherwise provided by a statute enacted after the date of enactment of this Act. (Emphasis added).

The regulation, to which the statute refers, reads in part, as follows:

"PART 704–PLAN FORMULATION STANDARDS AND PROCEDURES"

"Subparts A–D–(Reserved)"

"Subpart E–Standards for Plan Formulation and Evaluation"

"§ 704.39 Discount rate."

"(a) The interest rate to be used in plan formulation and evaluation for discounting future benefits and computing costs, or otherwise converting benefits and costs to a common time basis, shall be based upon the average yield during the preceding fiscal year on interest–bearing marketable securities of the United States which, at the time the computation is made, have terms of 15 years or more remaining to maturity: Provided, however, that in no event shall the rate be raised or lowered more than one–quarter of 1 percent for any year. The average yield shall be computed as the average during the fiscal year of the daily bid prices. Where the average rate so computed is not a multiple of one–eighth of 1 percent, the rate of interest shall be the multiple of one–eighth of 1 percent nearest to such average rate."

"(b) . . ."

"(c) . . ."

"(d) Where construction of a project has been authorized prior to the close of the second session of the 90th Congress, and the appropriate State or local governmental agency or agencies have given prior to December 31, 1969, satisfactory assurances to pay the required non–Federal share of project costs, the discount rate to be used in the computation of benefits and costs for such project shall be the rate in effect immediately prior to the effective date of this section, and that rate shall continue to be used for such project until construction has been completed, unless the Congress otherwise decides."

In making a decision as to whether or not a sponsor has provided the "satisfactory assurances" that it will pay the non–federal share of the project, which are called for in both the statute and the regulation, the SCS determines whether the sponsor is a responsible organization which is ready and able to carry out its commitment (Tr. 109), which could involve the creation of a special district (Tr. 109) or the sponsor could have sufficient cash resources to fulfill its obligation (Tr. 110). If funds are to be borrowed by a district, the SCS determines if there are sufficient lands in the district to enable the district to assess its members for sufficient revenue for use of water developed by the project to pay off any note or bonds used to finance the non–federal share of the project. (Tr. 110). Finally, the basis for the SCS determination that there were satisfactory assurances prior to December 31, 1969 was basically that there was a work plan agreement, that the sponsors had the ability and legal authority to meet the legal obligations of the district and that they were doing what seemed reasonable to carry out their part of the Project. The parties to the Work Plan Agreement were all legal entities, or in the case of the District a de facto entity that on reorganization became a legal entity and a governmental subdivision of Wyoming (41–8–110, W.S. 1977), with ability to meet their commitments. There is a substantial amount of land in the District that can be taxed to pay off bonds issued by the District. (Govt. Ex. G, Item 8a, Tr. 95–96). The District also incurred and paid substantial legal expenses related to the proposed project (Tr. 73, 98), which indicates an ability to meet its obligations. Also, the Toltec Watershed Improvement District filed an application dated August 12, 1969, for a loan from the Farmers Home Administration with which to acquire the reservoir site, and the Farmers Home Administration on June 28, 1974 approved a loan for $200,000 with a 50–year repayment period and a 4.012 percent interest rate (Tr. 305, Pl. Ex. 9). The FmHa

loan cannot be closed until the land cost is determined through the condemnation action (Tr. 319). Although, on December 16, 1969 the Board of Directors of the Toltec Watershed Improvement District adopted a resolution that bonds of the District "should be issued and sold for the purpose of providing the District's share of the costs involved in the acquisition of the land for the reservoir site and construction of Toltec Reservoir" (Def. Ex. G., Item 11 p. 5), the District has not been in a position to finalize the issuance of bonds because of litigation over the project which commenced June 15, 1970 and has continued in one form or another for the last ten years. In spite of that protracted litigation, the District wishes to proceed with the project (Tr. 65). The Court finds that the State Conservationist of the SCS received satisfactory assurances that the sponsors of the project would pay the regional non–federal share of the Project costs.

We believe that the Congressional intent in 42 U.S.C. 1942d–17(b) is obviously to allow the federal agency involved to make the necessary determination of whether or not the "satisfactory assurances" are sufficient, because the statute does not define that term but leaves it within the discretion of the administrative agency to determine. In such a case, the Court should not substitute its judgment for that of the administrative agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Strickland v. Morton*, 519 F.2d 467 (10th Cir. 1975). The agency interpretation of the statute is entitled to great weight. *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). The fact that the bond issue was not completed, or appraisers appointed and assessment derived against the District acreage, or a hearing held in compliance with § 41–8–116, W.S. 1977, or that the District had no bank account, or did not own the land for the reservoir, or had not concluded the F.H.A. loan, are all matters that stem directly from the actions of the plaintiffs who have fought the reservoir project with tenacity seldom seen. These alleged deficiencies can all be supplied speedily in the absence of litigation. The long and many delays in construction of the project were without doubt the result of the obstructive and continuous litigation in which the parties have been embroiled. Actual suit or the threat of legal challenge has constantly overshadowed this project. Those legal obstacles included:

(1) A letter dated January 24, 1968, from an attorney for the Plaintiff, Associated Enterprises, asking the SCS "What the channels might be through which protest of this Work Plan could be rendered." (Govt. Ex. G, Item 4).

(2) A filing on or about June 25, 1969, by Plaintiff, Associated Enterprises, for a reservoir permit on the same site as the proposed Toltec project, which filing was denied by the State Engineer on December 18, 1969. Plaintiffs' Response to Defendants' Request for Admissions, No. 11.)

(3) Refusal to allow entry upon the reservoir site for engineering studies which resulted in entering a judgment allowing the Toltec Watershed Improvement District to enter upon Associated's land to conduct foundation studies for the dam site, and Associated Enterprises' appeal to the Wyoming Supreme Court challenging the constitutionality of the State statute governing the creation of such districts. *Associated Enterprises, Inc., et al. v. Toltec Watershed Improvement District*, 490 P.2d 1069 (Wyo. 1971). The case was then taken by Associated Enterprises to the U.S. Supreme Court which also held that the statute was constitutional. *Associated Enterprises, Inc., et al. v. Toltec Watershed Improvement District*, 410 U.S. 743, 93 S.Ct. 1237, 35 L.Ed.2d 675 (1973).

(4) The Toltec Watershed Improvement District filed suit on October 1, 1974 in the District Court for Albany County, Wyoming, to condemn land owned by the Plaintiff, Associated Enterprises, for this project. After extensive litigation regarding the necessity of the taking the Court ruled the plaintiffs had the authority to condemn. Before the matter was finalized, and taking authorized, this suit was filed and further proceedings have been stayed pending the outcome of the present case.

(5) Less than two months after the condemnation suit was filed on November 25, 1974, Associated Enterprises, Inc., filed suit against the State Engineer in the First Judicial District of Wyoming (Civil No. 75–269) to invalidate Permit No. 7252 which had been issued to the Toltec Watershed Improvement District. The case was dismissed on May 14, 1975. On October 30, 1975, the Wyoming Supreme Court dismissed the appeal (No. 4581) from the District Court's decision.

(6) On November 12, 1976, the State Engineer approved an extension of time for the Toltec Watershed Improvement District to commence and complete construction of the reservoir under Permit 7252. On December 12, 1976, Associated Enterprises, Inc., filed suit (Civil Action 80–148) in the First Judicial District of Wyoming to obtain review of the State Engineer's decision. (Tr. 359). The District Court affirmed the State Engineer's order. Associated Enterprises appealed to the Wyoming Supreme Court, which affirmed the District Court decision on May 18, 1978.

(7) Letters of objection at various stages of the administrative proceedings (Defendants' Ex. G).

(8) The complaint in the present case which was filed on September 20, 1978. But for those legal barriers, which were in no way caused or initiated by the federal defendants, with the possible exception of this suit to require an EIS to be prepared, the project would have gone forward at a time when the 3¼% discount rates were more realistic. It is little wonder that many of the financing details of a large project, like this, have not been concluded. But, the evidence before the Court shows that there is a means of financing the construction of it now, even at its present–day higher cost. To conclude now that the ranchers who wish to build the reservoir in order to irrigate more of their lands can't do so now because the discount rate of 3¼% prevailing when they first tried to construct it is not available to them for purposes of determination of the cost–benefit ratio would grant Associated Enterprises the final victory, after it has lost each of the other suits in the past ten years. Such a result is manifestly inequitable.

Following the entry of this Court's order of October 11, 1978, retaining jurisdiction while the EIS was under preparation, the State Conservationist, on October 13, 1978, appointed an interdisciplinary planning team to prepare the EIS. Between October, 1978 and April, 1979, procedural steps were taken which resulted in preparation of a preliminary draft EIS, which was circulated within the SCS in Wyoming in early April, 1979. On June 4, 1979, the SCS conducted a field evaluation of wildlife habitat in reservoir area with biologist from USFWS and WGF. Range site and condition class determinations and a modern soil inventory were also commenced (Govt. Ex. G, Item 54). A notice of intent to prepare an EIS was published in the Federal Register on July 13, 1979. (Def. Ex. G, Item 50). A public meeting to discuss the draft EIS was held in the high school cafeteria in Rock River, Wyoming, on August 13, 1979 pursuant to proper notice, at which the Plaintiff, Associated Enterprises, was represented by Wilson Burnette. Thereafter, a revised draft EIS was prepared and sent for interagency review and comment (Def. Ex. G–1, Item 56), copies were sent to the Environmental Protection Agency and to representatives of the plaintiffs and all other interested agencies and parties (Def. Ex. G–1, Item 64), and a notice of the availability of the draft EIS was published in the Federal Register on September 28, 1979 (44 F.R. 56091–56092). The Final EIS was filed with the Court on January 18, 1980. After the comment period, on the draft EIS, had expired responses were included to all comments received. A record of decision, dated February 22, 1980, accepting the Final EIS was signed by the State Conservationist. (Govt. Ex. G–1, Item 85). This particular EIS was commended by the SCS Regional Office as one of the best prepared in the eleven Western States last year.

While the plaintiffs question the sufficiency of the Final EIS on the ground that it fails to quantify, consider and analyze environmental values, such as loss of

productive capacity of plaintiffs' land, loss of tax revenues, effect on plaintiffs' ranching operations, creation of mudflats when irrigation water is being used, effect on the Greyrocks Project downstream, effect on wildlife habitat in the area, and impact of additional people on the environment, the Court finds that the EIS considered these matters at least in passing, if not in exhaustive detail, as well as all others raised by plaintiffs. In each area of consideration the EIS meets and fully complies with the National Environmental Protection Act, 42 U.S.C. § 4321 et. seq. and the regulations promulgated thereunder by thoroughly reviewing each issue and choosing an alternative which reflected said consideration. It contains a reasonable discussion of the environmental impact of the proposed action, the adverse environmental effects, alternatives to the proposed action, the relationship between short–term uses of the environment and maintenance of long–term productivity, and considerations of irreversible commitments of resources involved in implementation of the proposed action. We cannot find that it is inadequate. We agree that it is commendable and meets the objective good faith requirements of NEPA. In *National Helium Corp. v. Morton*, 486 F.2d 995, 1002–1003 (CA 10 1973), the Court of Appeals of the Tenth Circuit said:

> "In summary, then, our view is that the review of EIS is limited to the following:
> '(1) Whether EIS discusses all of the five procedural requirements of NEPA.'
> '(2) Whether the environmental impact statement constitutes an objective good faith compliance with the demands of NEPA.'
> '(3) Whether the statement contains a reasonable discussion of the subject matter involved in the five required areas.' "

The *National Helium* standard of review has been reiterated in *Manygoats v. Kleppe*, 558 F.2d 556 (CA 10 1977), and by the U. S. Supreme Court in *Stryker's Bay Neighborhood v. Karlen*, 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980). The role of the courts in reviewing an EIS is a limited one, the question being essentially whether or not the agency followed the necessary procedural requirements. *Daly v. Volpe*, 514 F.2d 1106 (CA 9 1975). We cannot go beyond that said area of review. We conclude that the SCS met the *National Helium* requirements as well as the NEPA procedural requirements.

We are not unsympathetic to the plaintiffs' pleas to preserve the status quo for the beauty and tranquillity of the area. But, this is the only available reservoir site on the North Laramie River. The ranchers of the area stand united for its construction to enhance their water–short lands. Only the plaintiffs, with sufficient water for their lands, oppose it. Although the conclusion that this Project may accomplish the greatest good for the greatest number seems obvious, such considerations are irrelevant here. They should be considered by the District Court of Albany County, Wyoming in its determination of the condemnation issue, for they relate to issues of necessity and damages.

For the foregoing reasons, the Court finds for the defendants and against the plaintiffs on the issues of the counterclaim of the defendants and the reply of the plaintiffs thereto, and it is

ORDERED, ADJUDGED AND DECREED as follows:

■ 1. That the Environmental Impact Statement prepared by the Soil Conservation Service for the Toltec Reservoir is in full and complete compliance with the National Environmental Protection Act 42 U.S.C. § 4321 et seq. and regulations promulgated thereunder.

■ 2. That the procedures followed by the United States Soil Conservation Service in preparation of the Final Environmental Impact Statement for the Toltec Reservoir complies with the National Environmental Policy Act.

■ 3. That the 3¼% interest or discount rate utilized by the said Soil Conservation Service in the calculation of benefits or costs, amortized over a period of 50 years, is permissible under the provisions of Public Law 93–251, March 7, 1974 (42

U.S.C. § 1962d–17(b)), and that the administrator of the Soil Conservation Service did receive satisfactory assurances that the sponsors of the project would pay the non-federal share of the project in the work plan agreement executed by the sponsors prior to December 31, 1969.

4. That the procedures used by the staff of the Soil Conservation Service in preparing the Environmental Impact Statement and determining to finally proceed with the project were legally reasonable discretionary acts on the part of the Administrator, and that the action of the Administrator in proceeding with the Toltec Reservoir project pursuant to the Watershed Work Plan under alternative (a) set forth in the Environmental Impact Statement is a reasonable act on the part of the Administrator based upon his discretion reached after full and thorough consideration of all of the alternatives available to him. It is Further

ORDERED that since the Complaint of the plaintiffs has heretofore been granted by the Court, no further action is required and that the Counterclaim of the defendants be and it is hereby granted, each party to pay their own costs herein.