James TROUT, Appellant/Cross–
Respondent,

v.

STATE of Missouri, et al.,
Respondents/Cross–
Appellants.

No. SC 88476.

Supreme Court of Missouri,
En Banc.

July 19, 2007.

Supplemental Opinion Aug. 27, 2007.

Charles W. Hatfield, Jefferson City, Jane E. Dueker, Gretchen Garrison, St. Louis, for Appellant/Cross–Respondent.

Jeremiah W. (Jay) Nixon, Atty. Gen., Alana M. Barragan–Scott, Asst. Atty. Gen., Jefferson City, for Respondent/Cross–Appellants.

LuAnn V. Madsen, Jefferson City, for amicus curiae Society of Governmental Consultants.

Harvey M. Tettlebaum, Robert L. Hess II, Jefferson City, for amicus curiae Missouri Republican State Committee.

Stephen L. King, Kelly E. Shamel, St. Louis, for amici curiae Laura T. Bryant and David Griege.

Edward D. Robertson, Jr., Jefferson City, for amicus curiae Majority Funds, Inc.

Todd P. Graves, Edward D. Greim, Kansas City, for amicus curiae Senator Charlie Shields, Missouri 34th District.

Joshua M. Schindler, St. Louis, for amicus curiae Rex and Jeanne Sinquefield.

Albert A. Riederer, Kansas City, for amicus curiae Riederer for Mayor Committee.

STEPHEN N. LIMBAUGH, JR., Judge.

This case involves procedural challenges to the validity of H.B. 1900—the so-called campaign finance reform bill enacted in

2006—on the basis of alleged violations of the clear title, single subject and original purpose requirements of article III, sections 21 and 23 of the Missouri Constitution. The trial court invalidated two statutes within the bill, section 115.342, RSMo Supp.2006, (disqualifying persons who are delinquent on certain taxes from running for office) and section 115.350, RSMo Supp.2006, (disqualifying felons from running for office), and severed those statutes from the bill. In addition, the trial court invalidated and severed section 130.032.2, RSMo 2006—which banned statewide candidates from accepting contributions during the legislative session—on separate First Amendment grounds. Appellant Trout appeals the trial court's judgment to the extent it does not invalidate the entire bill. Respondents appeal the court's invalidation and severance of sections 115.342 and 115.350, but they do not appeal the invalidation and severance of section 130.032.2. This Court has jurisdiction. Mo. Const. art. V, sec. 3. Affirmed in part and reversed in part.[1]

The facts are straightforward and undisputed: H.B. 1900 was introduced and read the first time on February 28, 2006. As originally introduced, H.B. 1900 was titled, "An Act to repeal [seven statutory sections] and to enact in lieu thereof seven new sections relating to campaign finance." Thereafter, the full House took up and adopted a House committee substitute that contained virtually the same title as the original bill except to reflect that only six sections instead of seven were being repealed and reenacted. A Senate substitute was then introduced with multiple amendments, and the title of the bill was changed to "An Act to repeal [thirteen sections] and enact in lieu thereof sixteen

new sections relating to ethics, with an effective date." After more amendments were made on the Senate floor, the bill was adopted and sent to a conference committee to reconcile the differences. The House and Senate adopted a final version on May 11, 2006, that contained essentially the same title as the Senate substitute but repealed twelve sections and enacted sixteen new sections. The bill was signed by the Governor and became effective January 1, 2007.

Plaintiff then filed his petition for declaratory judgment and injunctive relief asserting that H.B. 1900 must be struck down in its entirety. Based on the stipulated facts, the trial court held that H.B. 1900 did not violate the clear title requirement of article III, section 23 but that the addition of sections 115.342 and 115.350 dealing with candidate disqualification constituted a change in the original purpose of H.B. 1900 and introduced an additional subject in violation of article III, sections 21 and 23, respectively. That original purpose and subject, the court explained, related solely to campaign finances, not to the broader topic of "ethics," as in the bill finally passed. As noted, the court also held that the section 130.032.2 ban on campaign contributions during the legislative session violated the First Amendment. The court then severed these three sections from the bill and upheld the validity of the remainder. This appeal followed.

This Court's disposition of the procedural challenges to H.B. 1900 is informed by a closely analogous case decided just last month, *Jackson County Sports Complex Authority v. State of Missouri*, 226 S.W.3d 156 (Mo. banc 2007), though neither the parties nor the trial court had the benefit of that precedent. In that case, the Sports

---

1. The Missouri Republican State Committee and the Missouri Society of Governmental Consultants filed briefs as amicus curiae.

Complex Authority brought suit to invalidate a statute mandating competitive bids for certain expenditures made by a county sports complex authority because the statute was a part of two bills enacted in violation of the constitution's original purpose and clear title requirements. The precise basis for the original purpose challenge was that amendments to the bills had changed their original purpose from a narrow purpose (one bill "affected the duties of county commissions in procuring supplies and permitted [certain] water supply districts ... to recover from an occupant of real estate sums due for services provided," and the other bill "related to salaries of county officials, annual assessments by county assessors and salaries for county public administrators") to the new, different and larger purpose of "relating to political subdivisions." *Id.* at 159–60. With respect to the clear title challenge, the argument was that the title "relating to political subdivisions" was impermissibly overbroad and too amorphous to clearly identify the contents of the bill.

At the outset, this Court restated the standard of review, applicable here as well, which is that:

> laws enacted by the legislature and approved by the governor have a strong presumption of constitutionality.... [T]he use of procedural limitations to attack the constitutionality of statutes is not favored.... [T]his Court 'interprets procedural limitations liberally and will uphold the constitutionality of a statute against such an attack unless the act clearly and undoubtedly violates the constitutional limitation' ... [and] the burden of proof rests on the statute's challenger.

*Id.* at 160 (citations omitted).

In denying plaintiff's challenge on the merits, this Court first reiterated the well-

established rules pertaining to original purpose jurisprudence:

> Article III, section 21, prohibits any bill from being "so amended in its passage through either house as to change its original purpose." This Court has long held that the original purpose prohibition does not restrict legislators from making "[a]lterations that bring about an extension or limitation of the scope of [a] bill," and "even new matter is not excluded if germane." Rather, the prohibition is against amendments that are clearly and undoubtedly not "germane"; that is, they are not "[r]elevant to or closely allied" with a bill's original purpose. "As the cases illustrate, the general purpose is often interpreted as an overarching purpose, not necessarily limited by specific statutes referred to in the bill's original title or text." Moreover, a bill's original purpose is not limited to what is stated in the bill's original title, which can be changed without violating article III, section 21.

*Id.* (citations omitted). Applying these rules, this Court then held that "the general, or overarching purpose of [both bills] as originally introduced can fairly be said to be the regulation of political subdivisions" and that "[t]he purpose was not so narrowly limited, as the trial court held, to the subject matter of the specific statutes referenced in the original text." *Id.* at 160–62.

Regarding the clear title claim, this Court again reiterated the well-established rules, as follows:

> Article III, section 23 states that "[n]o bill shall contain more than one subject which shall be clearly expressed in its title." This provision contains two distinct but related procedural limitations—a single subject rule and a clear title requirement. The clear title re-

quirement is intended to keep "legislators and the public fairly apprised of the subject matter of pending laws." To do this, the title need only "indicate in a general way the kind of legislation that was being enacted." ... Only if the title is (1) underinclusive or (2) too broad and amorphous to be meaningful is the clear title requirement infringed. Furthermore, for bills that have "multiple and diverse topics" within a single, overarching subject, that subject may be "clearly expressed by ... stating some broad umbrella category that includes all the topics within its cover."

*Id.* (citations omitted).

In holding that there was no clear title violation, this Court stated, "The term, 'political subdivision' in the larger sense, is a broad umbrella category that includes all of the differing definitions of 'political subdivisions' under its cover." *Id.* at 162. The import, then, was that the title of the bill "relating to political subdivisions" was not an impermissibly overbroad category, and the statute requiring competitive bidding by the Sports Complex Authority was simply a statute pertaining to a particular kind of political subdivision in a bill pertaining to several kinds of political subdivisions.

■ Drawing on our analysis in *Sports Complex Authority,* this Court holds that the trial court in this case correctly denied plaintiff's clear title challenge but erred in sustaining the original purpose challenge. The title, "relating to ethics," is the same kind of broad, umbrella category this Court has approved not only in *Sports Complex Authority* but in other relatively recent cases as well. *See, e.g., Missouri State Med. Ass'n. v. Missouri Dept. of Health,* 39 S.W.3d 837, 841(Mo. banc 2001) (no clear title violation in bill entitled "relating to health services"); *Corvera Abatement Tech. v. Air Conservation Comm'n*

973 S.W.2d 851, 861–62 (Mo. banc 1998) (no violation in bill entitled "relating to environmental control"). Ultimately, the title "relating to ethics" is not so broad and amorphous that it describes "most, if not all, legislation passed by the General Assembly;" rather, the title fairly identifies the contents of the bill. That said, this title, like that in *Sports Complex Authority,* "may well represent the outer limit permitted." *Sports Complex Authority,* 226 S.W.3d at 162.

■ In much the same way, "ethics" can fairly be said to be the original purpose of H.B. 1900 because the regulation of the ethical conduct of lobbyists, public officials and candidates is indeed the general or overarching purpose of the campaign finance provisions that were set out in the original version of the bill. The purpose of the bill, in other words, was not narrowly limited to the text of those original provisions. *Id.* at 160–62. *See also, Missouri State Medical Ass'n,* 39 S.W.3d at 839–40 (holding that a bill that "would have enacted a new section of law requiring that health insurers cover ... pelvic, prostate, and colorectal examinations and other cancer screenings" had an original purpose in the larger sense of "mandat[ing] health services for serious illnesses, including cancer"); *C.C. Dillon Co. v. City of Eureka,* 12 S.W.3d 322, 325–26 (Mo. banc 2000) (holding that a bill that "related to transportation" did not lose its original purpose by an amendment adding a provision giving cities and counties the authority to adopt outdoor advertising regulations for highway billboards); *Stroh Brewery Co. v. State,* 954 S.W.2d 323, 325–26 (Mo. banc 1997) (holding that a bill providing for the auction of vintage wine had an original purpose of amending the State's liquor control law and that an amendment adding malt liquor labeling requirements was permissible). Furthermore, the section

115.342 and 115.350 candidate disqualification amendments that gave rise to the original purpose challenge are germane to the original purpose of ethics. Certainly the disqualification of persons from running for office who are delinquent on certain taxes, sec. 115.342, or who are felons, sec. 115.350, goes to the very essence of ethics regulation.

 The trial court also erred in sustaining plaintiff's challenge that the amendments adding sections 115.342 and 115.350 violated the article III, section 23 prohibition against bills that contain more than a single subject. Although *Sports Complex Authority* did not present a single subject challenge, single subject analysis is similar to original purpose analysis. Like the emphasis on a general, overarching purpose in original purpose analysis, single subject analysis turns on the "general core purpose of the proposed legislation." More specifically, article III, section 23 dictates that the subject of a bill include "all matters that fall within or reasonably relate to [that] general core purpose." *City of St. Charles v. State,* 165 S.W.3d 149, 151 (Mo. banc 2005). To determine, then, whether a bill violates the single-subject rule, the test is "not whether individual provisions of a bill relate to each other ... [but] whether [the challenged provision] fairly relates to the subject described in the title of the bill, has a natural connection to the subject, or is a means to accomplish the law's purpose." *Id.* Further, "[w]hether a bill violates the single-subject requirement is a determination made as to the bill as finally passed." *Stroh Brewery Co.,* 954 S.W.2d at 327.

For instance, in *Missouri Medical Association,* a bill that contained provisions relating to health insurance, medical records, pre-operative information on breast implants, HIV confidentiality, and insurance for treatment of mental illness and chemical dependency contained only a single subject because the provisions were "(at least) incidents or means to" the purpose or subject of the bill as expressed in the title, *i.e.,* "health services." *Missouri Medical Ass'n,* 39 S.W.3d at 840–41. An even more permissive example is *City of St. Charles,* in which this Court held that a bill relating to the core subject of emergency services contained a single subject even though it also included a provision that prohibited tax-increment financing districts in flood plains. *City of St. Charles,* 165 S.W.3d at 151–52. Though at first glance the provision appeared nonrelated, prohibiting TIFs in flood plains was fairly related to discouraging development in flood plains, thereby decreasing the need to provide emergency services in those areas. *Id.* In contrast, this Court found a single subject violation in *Rizzo v. State,* 189 S.W.3d 576, 579–80 (Mo. banc 2006), where a provision that related to candidacy for statewide elective office was found to be beyond the core subject of the bill, which was titled "relating to political subdivisions." Statewide offices, the Court determined, had no relation to political subdivisions within the state. *Id.*

Under these precedents, it is clear that the single subject of H.B. 1900 is the general, core subject of ethics, rather than the narrow subject of campaign finance as determined by the trial court. Furthermore, just as in the original purpose analysis, the section 115.342 and section 115.350 candidate disqualification amendments fit well within the core subject of ethics. Accordingly, there is no single subject violation.

Having determined that the trial court erred in finding original purpose and single subject violations, the question of whether the invalidation of sections 115.342 and 115.350 required invalidation of H.B. 1900 in its entirety or whether

those sections can properly be severed is moot.

■ The question remains, however, whether the trial court's invalidation of section 130.032.2—the provision that banned campaign contributions during the legislative session—requires that the seven other subsections of section 130.032 be invalidated as well, or whether subsection 2 may properly be severed from the statute as the trial court held. Plaintiff makes no claim that the invalidation of section 130.032.2 alone requires invalidation of the entire bill.

Section 1.140 sets out the rules for severability, which begin with the presumption that provisions of a bill that are invalidated shall be severed from the remainder of the bill. That section states:

> The provisions of every statute are severable. If any provision of a statute is found by a court of competent jurisdiction to be unconstitutional, the remaining provisions of the statute are valid unless the court finds the valid provisions of the statute are so essentially and inseparably connected with, and so dependent upon, the void provision that it cannot be presumed the legislature would have enacted the valid provisions without the void one; or unless the court finds that the valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

Despite the presumption of severability, plaintiff contends that "the void provision banning campaign contributions is inseparably connected with other provisions of H.B. 1900 which repeal and reenact Section 130.032 in its entirety ... that the other provisions of the bill which repealed and reenacted Section 130.032.2, standing alone, are incomplete and incapable of being executed in accordance with legislative intent ... [and that] as such, the repeal and reenactment of all of Section 130.032 is void." Ultimately, though, the issue is simply whether the legislature would have enacted the valid provisions within section 130.032 without enacting subsection 130.032.2. Ideally, the resolution of this and other severance issues, consistent with section 1.140, and true to legislative intent, is by reference to the substantive legislative history, or drafting history, of the bill. *See* Martha J. Dragich, State Constitutional Restrictions on Legislative Procedure: Rethinking the Analysis of Original Purpose, Single Subject, and Clear Title Challenges, 38 Harv. J. on Legis. 103, 157 (2001).

In that regard, it is necessary to track H.B. 1900 as it pertained to section 130.032 through the legislative process. Before the enactment of H.B. 1900, section 130.032 contained seven subsections dealing with campaign contributions that, in general, limited the amount of campaign contributions that could be made or accepted by candidates for public office. H.B. 1900 went from the House to the Senate without any change in section 130.032 and with the monetary contribution limits intact. In the Senate, however, a floor amendment was offered and adopted amending section 130.032 by eliminating the campaign contribution limits, but instituting a "black-out" period, as set out in subsection 130.032.2, so that no contributions to statewide candidates could be made or accepted during the legislative session. Another amendment was then offered on the Senate floor to strike the black-out period in subsection 130.032.2, the result of which would have been to allow unlimited contributions throughout the year, but that amendment failed. Thereafter, the bill was sent to a conference committee, and ultimately the House adopted the Senate version of the bill.

The course of this legislation makes clear that the campaign contribution limits

would not have been repealed without the coterminous enactment of the black-out period. That the two provisions were inseparably connected and dependent upon each other is conclusively proven by the fact that the Senate amendment to decouple the provisions failed. Conversely, the failure of that amendment conclusively disproves respondents' allegation that the General Assembly would have abolished campaign contribution limits even in the absence of the unconstitutional black-out period. Thus, under section 1.140, the subsection 130.032.2 black-out period cannot be severed from the repeal of the campaign contribution limits in the other provisions of section 130.032, and because the black-out period was declared invalid (and no appeal followed from that part of the trial court's judgment), the repeal of the campaign contribution limits is also invalid. *See Associated Indus. of Missouri v. Dir. of Revenue*, 918 S.W.2d 780, 785 (Mo. banc 1996) (unconstitutional applications of "use tax" statute not severable where remaining applications would have imposed "patchwork tax scheme" that General Assembly had previously rejected). The result is that section 130.032 as it was constituted before H.B. 1900 remains the same. *State v. Neill*, 78 S.W.3d 140, 143 (Mo. banc 2002).

In sum, the judgment of the trial court is reversed to the extent that 1) it invalidated and severed sections 115.342 and 115.350 of H.B. 1900 and 2) it failed to invalidate the repeal and reenactment of section 130.032 in its entirety. In all other respects, the judgment is affirmed.

All concur.

## SUPPLEMENTAL OPINION

### PER CURIAM.

The campaign finance reform bill, H.B. 1900, became effective on January 1, 2007.

James Trout filed suit challenging its constitutionality the following day. In its opinion of July 19, 2007, the Court found the removal of campaign limits could not be severed from the blackout provision that the trial court found to be unconstitutional. The Court invited interested parties to submit letter briefs as to the appropriate remedy, particularly whether the Court's decision should be applied prospectively only.

 The law concerning whether a decision is given retroactive or prospective application is simple in theory. "An unconstitutional statute is no law and confers no rights. This is true from the date of its enactment, and not merely from the date of the decision so branding it." *State ex rel. Miller v. O'Malley*, 342 Mo. 641, 117 S.W.2d 319, 324 (Mo. banc 1938); *see also Norton v. Shelby County*, 118 U.S. 425, 442, 6 S.Ct. 1121, 30 L.Ed. 178 (1886). Solely prospective application of a decision is the exception not the norm because it involves judicial enforcement of a statute after the statute has been found to violate the Constitution and to be void and without effect *ab initio*. *State ex rel. Cardinal Glennon Mem'l Hosp. for Children v. Gaertner*, 583 S.W.2d 107, 118 (Mo.1979). *Sumners v. Sumners*, 701 S.W.2d 720, *722–23* (Mo. banc 1985), reaffirmed the "general rule of retroactive effect of changes in the law wrought by [the court's] decisions." *Cardinal Glennon* and *Sumners* hold, however, that one may be excepted from such retroactive application of a decision, "to the extent that [retroactive application] causes injustice to persons who have acted in good faith and reasonable reliance." *Id.* There is no suggestion here that any candidate has acted in bad faith; the issues are whether there was reasonable reliance and whether injustice was shown.

In applying these principles, the Court uses a balancing test to determine the scope of any hardship or injustice that would justify making an exception to the general rule of retroactive application. *Sumners*, 701 S.W.2d at 723. "A court must balance the hardship imposed on those who may have relied on [the previous rule] against the hardship which may result for those who do not benefit from the application of a change in [the rule]." *Id.* at 723–24. In balancing the determination of whether to grant prospective relief, the court must also evaluate the extent and conditions of such extraordinary relief.

Application of this balancing test to Mr. Trout is simple. He has not suggested that he would experience injustice if the decision is applied retroactively to him. To the contrary, he has refused to raise funds in excess of the limits the legislature previously imposed in his incipient candidacy for elected office. Therefore, as to Mr. Trout, the usual rule applies, and the decision is fully retroactive.

The injustice of applying the July 19 decision retroactively to those candidates (and their committees) whose campaigns were concluded prior to that date is also evident, even on this limited record. In such cases, the candidates would already have expended most or all the funds collected and would have a greatly reduced ability and little incentive to raise additional funds, thus working a manifest injustice if the invalidation were retroactively applied to them. All parties concede that the balancing of relevant factors unequivocally

favors prospective-only application to such candidates.

Such a bright-line rule cannot be drawn as to other candidates that are not parties to this action, however, because the question whether retroactive application would work an injustice as to them necessarily is dependent on the degree of notice, reliance and hardship shown by that particular candidate or class of candidates. It cannot be determined from the limited record before this Court whether few or numerous such other candidates or classes of candidates exist for whom fully or partially prospective application would be appropriate, and it would be inappropriate for this Court to speculate about fact situations not before it in this case.

The Court cannot determine, for example, whether non-parties reasonably relied on the validity of the prior statute because the record is silent as to the extent and nature of their awareness of this pending litigation, and its consequences for campaign contributions. While all existing candidates raised money with at least constructive knowledge that the statute in question was being challenged, the issue of their actual notice of this litigation is undeveloped. Questions may arise whether the invalidity of the provision eliminating contribution limits was reasonably foreseeable by these persons. It was implicitly raised at trial, but was not expressly discussed until proceedings on appeal in this Court.[1] On the other hand, it has been clear since suit was filed that if the clear title challenge was successful, the entire section would be invalid, including the provision

1. The validity of the blackout provision was clearly raised at trial and addressed in the trial court's January order enjoining its enforcement. The question whether the remainder of the statute would be severable and valid was, thus, at least implicitly before the trial court. Mr. Trout expressly mentioned non-severability of the contribution limits in his notice of appeal, which was filed on April 19, and he developed the argument further in his opening brief to this Court, which was filed on May 4. The parties subsequently briefed the issue in full, and it was addressed by the Court and the parties at oral argument on June 21.

removing campaign limits. Without some record regarding actual notice, the Court cannot determine whether there was reasonable reliance. *See Akin v. Missouri Gaming Comm'n*, 956 S.W.2d 261, 265 (Mo. banc 1997) (refusing prospective-only application of a decision to entities that clearly had notice of the litigation and therefore, could not have reasonably relied).[2]

The record is similarly silent as to the extent of the hardship that a bright-line rule of retroactivity might cause for particular candidates or committees. The hardship determination will depend, in part, upon the amount of contributions that any such candidate or candidate committee may have accepted over the limits previously imposed, and the extent to which any candidate has spent or encumbered those contributions. Depending on the amount of money involved, it could become prohibitively difficult and expensive to require candidates to refund this money. It might also be a futile effort, as the donors could skirt the limitations on direct contributions using the indirect avenues of contribution that the legislature intended to render obsolete when it abandoned individual contribution limits. Without a record as to the amount of those contributions, however,

the Court simply cannot reach a conclusion as to whether it presents sufficient hardship to deviate from the usual rule.

Moreover, no candidate's campaign can be considered in a vacuum. It could create, rather than alleviate, hardship and injustice if only certain candidates who enjoyed periods of unlimited fundraising are granted prospective application of the Court's July 19, 2007, opinion. Those candidates who have not yet or have only recently entered the field might have great difficulty matching the sums their opponents raised if they were subjected to campaign contribution limits that had not been applied to their opponents. It is well accepted that "virtually every means of communicating ideas in today's mass society requires the expenditure of money.... The electorate's increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication indispensable instruments of effective political speech." *Buckley v. Valeo*, 424 U.S. 1, 19, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Such an uneven playing field raises obvious equitable and constitutional concerns. *See Anderson v. Celebrezze*, 460 U.S. 780, 802, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *see also Reynolds v. Sims*, 377 U.S. 533, 564,

---

**2.** In *Cardinal Glennon*, 583 S.W.2d 107, unlike here, the harm of retroactive application to all entities was both uniform and readily ascertainable: all those who relied on the statute to toll the statute of limitations would have been left out of court by retroactive application. In this case, the harms to individual candidates can vary greatly, from Mr. Trout, to whom there is no harm in retroactive application, to concluded campaigns, as to which all agree great harm would result, to other non-party candidates, whose circumstances are as yet unknown. Judge Limbaugh's separate opinion concurring in part and dissenting in part finds that, as a matter of law, these other non-party candidates would suffer a grave injustice from retroactive application of this ruling. But, before

reaching that issue, they must show reasonable reliance on the provision lifting contribution limits. Whether they can show such reliance and hardship depends on many factors, including their awareness of the potential invalidity of that provision.

Unlike *Cardinal Glennon*, therefore, a factual record could support different conclusions regarding the hardship that retroactive application would impose on individual candidates or their committees. For this reason, this Court simply is unable to determine these issues as a matter of law (although, contrary to the concern of Judge Limbaugh's separate opinion, there is no reason typical factual records could not be quickly ruled on by the Ethics Commission).

84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("[f]ree and honest elections are the very foundation of our republican form of government"). In balancing these variables in an election case such as this, one must endeavor to avoid doing so in a way that creates a political advantage for one candidate over another by virtue of the decision.

In the case of this particular statute, the balancing of hardships and the determination whether retroactive application would work an injustice is further complicated by the fact that this Court's July 19 decision does not preclude the legislature from again enacting legislation lifting limits on campaign contributions. The Court invalidated the statute at issue in this case solely because it could not be severed from the blackout period the trial court found to be unconstitutional, rather than because a bill lifting contribution limits is inherently unconstitutional. Nothing in the July 19 decision precludes the legislature from enacting, in general or special session, new legislation that constitutionally lifts campaign limits entirely. Alternatively, it could enact new legislation that effectively reaffirms that campaign limits are in place because of the lack of a blackout period. Indeed, it would not be precluded from adopting more novel approaches in an effort to even the playing field, such as by enacting much higher campaign contribution limits or by enacting legislation that would impose contribution limits on a candidate only at such time, if any, as that candidate had reached the same level of contributions over permissible contribution limits as had other candidates for that office prior to this Court's July 19 ruling. The Missouri Constitution commits any such decision to the discretion of the legislative branch.

Finally, and of key importance, is the fact that it is not this Court, but the Missouri Ethics Commission, that must initiate any enforcement action to require disgorgement of campaign contributions as to those not before this Court. *See, e.g., State ex rel. Amer. Family Mut. Ins., Co. v. Scott,* 988 S.W.2d 45, 47 (Mo.App. S.D. 1998) ("Missouri courts have consistently held that no judgment can be granted against one who is not a party.") *See also* Sec. 511.020, RSMo 2000 (defining "judgment" as the "final determination of the right *of the parties* in the action") (emphasis added). Thus, any factual decision as to the reliance or hardship shown by this Court as to non-parties would only be dicta.

This Court holds that its decision is fully retroactive as to Mr. Trout and is fully prospective as to those whose campaigns were concluded prior to this Court's July 19, 2007 opinion. As to other candidates, not parties to this action, however, it will be up to the Ethics Commission to weigh relevant factors, including those specified in this opinion, in determining whether to take enforcement action against other candidates or committees for campaign contributions they received prior to this Court's July 19 opinion or such earlier date as they could no longer claim good faith and reasonable reliance.

In any case in which an enforcement action is taken, those individuals or committees must be given the opportunity to present, as a defense to that action, their individual facts and circumstances that they may contend present sufficient hardship to justify a departure from the usual rule of fully retroactive application. *See State ex rel. Cardinal Glennon Mem'l Hosp. for Children v. Gaertner,* 583 S.W.2d 107, 118 (Mo.1979); *Sumners v. Sumners,* 701 S.W.2d 720, 723 (Mo. banc 1985). If a candidate believes that retroactive application of the decision would be a hardship in his or her particular circumstances because he or she acted in good

faith and in reasonable reliance and retroactive application would work an injustice, that candidate must develop with specificity what those circumstances are to the Missouri Ethics Commission. In considering these factors in particular cases or classes of cases, however, the Commission must ensure that it not become a vehicle for creating an uneven playing field for a particular office; to do so would itself create an undue hardship for and injustice to the other candidates for that office.[3]

These are difficult concerns that can present in myriad ways for which the Court simply lacks a record at this time. The Court trusts that the parties possessed of enforcement authority, existing and future candidates, and the Missouri legislature will reach both individual and collective determinations that will maintain the even playing field for the political discourse necessary to maintain Missouri's vibrant democracy.

STITH, C.J., TEITELMAN, RUSSELL and WOLFF, JJ., concur.

PRICE, J., concurs in part and dissents in part in separate opinion filed.

LIMBAUGH, J., concurs in part and dissents in part in separate opinion filed.

**WILLIAM RAY PRICE, JR., Judge,** concurring in part and dissenting in part to supplemental opinion.

I agree with the majority opinion's statement of the law concerning retroactive/prospective application of decisions finding statutes to be unconstitutional. "An unconstitutional statute is no law and confers no rights .... from the date of its enactment, and not merely from the date of the decision so branding it." *State ex rel. Miller v. O'Malley,* 342 Mo. 641, 117 S.W.2d 319, 324 (Mo. banc 1938); *see also Norton v. Shelby County,* 118 U.S. 425, 442, 6 S.Ct. 1121, 30 L.Ed. 178 (1886). Prospective relief is the exception and not the rule because it involves judicial enforcement of a statute found to violate the constitution and to be void *ab initio.* This is an intrusion of judicial power into the arena ordinarily reserved for the legislative branch of government. *State ex rel. Cardinal Glennon Mem'l Hosp. for Children v. Gaertner,* 583 S.W.2d 107, 118 (Mo. banc 1979), did not change this. A decision finding a statute to be unconstitutional should be applied prospectively only "to the extent that it causes injustice to persons who have acted in good faith and reasonable reliance." *Id.*

I also agree that a balancing test is used to determine the scope of any hardship or injustice exception to the general rule of retrospective application. *Sumners v. Sumners,* 701 S.W.2d 720, 722–23 (Mo. banc 1985). Courts should look to the impact of prospective/retroactive application not only upon those who relied upon the statute, but upon all of those who might be affected by the Court's determination. *Id.* In balancing the determination of whether to grant prospective relief, a Court should also balance the extent and conditions of such extraordinary relief. I disagree with the majority opinion, however, on the proper application of the balancing test.

The letter briefs of the parties make clear the complications of applying this balancing test to the situation at bar. On the one hand, a number of candidates are said to have raised substantial sums in

---

**3.** So, for example, if the Ethics Commission grants a hardship exception to an individual candidate in the 2008 election cycle, the Commission—in the absence of legislative action that would level the playing field—has a duty to ensure that all candidates for that particular office are subject to equal treatment.

preparation for the 2008 elections. This money constitutes the political expressions of its donors. Refunding this money would be difficult and expensive. It might also be a futile effort, as the donors could evade those funding limitations using the very methods and techniques the legislature intended to eliminate. On the other hand, candidates who have not yet entered the field would have great difficulty matching those sums if they were subjected to the campaign contribution limits that had not been applied to their opponents. Such an uneven playing field raises obvious equitable and constitutional concerns. *See Anderson v. Celebrezze*, 460 U.S. 780, 802, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983).

One could also argue that prospective relief is not justified because there is no reasonable reliance. Existing candidates raised money with the knowledge that the statute in question was being challenged. This Court has previously cautioned against prospective application in such situations. *Akin v. Missouri Gaming Comm'n*, 956 S.W.2d 261, 265 (Mo. banc 1997). In fact, the candidates could only raise the funds in question during the legislative session in reliance upon the trial court's January 8, 2007, temporary restraining order indicating the unconstitutionality of the blackout period prohibiting fundraising during any legislative session. As this Court held, the blackout portion of H.B. 1900 was so important that the legislature would not have passed the law without it.[1] Thus, once the blackout period was invalidated, the candidates were aware of the likelihood that the entire law would be struck down, thereby invalidating all contributions over the limits previously imposed by section 130.032, RSMo 2000.

In balancing the above conflicting interests, courts should be extremely cautious. "Free and honest elections are the very foundation of our republican form of government." *Reynolds v. Sims*, 377 U.S. 533, 564, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (citations omitted). It is well accepted that "virtually every means of communicating ideas in today's mass society requires the expenditure of money.... The electorate's increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication indispensable instruments of effective political speech." *Buckley v. Valeo*, 424 U.S. 1, 19, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

To the extent that prospective only application of the Court's July 19, 2007, opinion would allow only certain candidates to enjoy the fruits of their unlimited fundraising, it would create, rather than alleviate, hardship and injustice. All candidates in any particular race must be subject to the same opportunity and/or limitations on their ability to raise money and participate in the political discourse crucial to our democratic process. If certain candidates are allowed the opportunity to retain and spend funds raised without limitation, then the same opportunity must be extended to all other candidates in the same race.

The Court must have no role in creating political advantage for one candidate over another.

Neither full retrospective nor full prospective application properly balances these considerations. Accordingly, I would apply this Court's decision prospectively from July 19, 2007, with the exception that any candidate may match the amount of contributions collected, between

---

1. The decision to incorporate this provision in H.B. 1900 is puzzling. A virtually identical statute was struck down in 1996 as violating the First Amendment. *Shrink Missouri Government PAC v. Maupin*, 922 F.Supp. 1413 (E.D.Mo.1996). There is no special virtue in exploiting a statute of known constitutional infirmity.

January 1, 2007, and July 19, 2007, by any other candidate for the same office, that exceeded the contribution limits specified by section 130.032, RSMo 2000. This would avoid injustice and hardship both to existing and future candidates and maintain the even playing field for the political discourse necessary to maintain Missouri's vibrant democracy. This approach would subject all candidates and their campaign committees to a single substantive rule with only the amount of unlimited contributions allowable varying race by race.

While I appreciate the majority's attempt to fashion a fair and workable remedy, I fear that their approach will prove to be neither. Although the majority provides the Ethics Commission with a general outline of its duties, they fail to offer clear guidance on how the Commission is to carry out its broad and vital mandate. The result is likely to be as many remedies as there are races. Not only is such a patchwork result unsatisfying, but it will only be achieved after a prolonged period of expensive litigation on a race by race basis both before the Missouri Ethics Commission and then—again—in the courts.

STEPHEN N. LIMBAUGH, Jr., Judge, concurring in part and dissenting in part to supplemental opinion.

I respectfully dissent from the holding of the supplemental opinion that "a bright-line rule cannot be drawn" and that "the question whether retroactive application would work an injustice ... necessarily is dependent on the degree of notice, reliance and hardship shown by [the] particular candidate or class of candidates." In my view, this Court's sole function is to decide whether its decision is prospective or retrospective as to all persons affected as has been this Court's practice with *every* case heretofore decided in which the prospective/retrospective issue was raised. Although the majority correctly decides that the decision is prospective for candidates who have completed their campaigns, I would hold that the decision is prospective for all candidates.

An across-the-board "prospective only" holding is fully supported by the law and the record. As the majority correctly notes, citing *State ex rel. Cardinal Glennon Mem'l Hosp. for Children v. Gaertner*, 583 S.W.2d 107, 118 (Mo. banc 1979), this Court will not make a decision retrospective "to the extent that it causes injustice to persons who have acted in good faith and reasonable reliance upon a statute later held unconstitutional." The injustice here is readily apparent from the fact (as tacitly stipulated by the parties) that between January 1 and July 19 hundreds of then-legal "over-limit" contributions were made to scores of candidates, Democrats and Republicans alike, for statewide, legislative, county, municipal, and judicial offices. These contributions would be deemed illegal and subject to refund if this Court's holding were retrospective. In this way, these candidates would be penalized for their initiative and resourcefulness in declaring their candidacy and raising funds early on, and they would lose any campaign advantage that they had rightfully earned. This is true for these candidates categorically: they suffer an injustice, great or small, whether they have to repay a million dollars or only a thousand dollars.

It is no answer to this injustice that it must somehow be weighed against a supposed corresponding injustice to the many candidates who did not declare and raise funds early on. These "might-file" candidates had the same opportunity and the same level playing field as the other candidates who took advantage of the opportunity. For this reason, any corresponding

injustice to "might-file" candidates is of their own making. Furthermore, it goes without saying that none of these hypothetical future candidates has any entitlement or vested right that the law would not be changed before they eventually declared their candidacies. Indeed, the majority invites the legislature to do just that! This means too, as the majority would necessarily concede, that it is altogether uncertain what the law will be for the "might-file" candidates who wait.

The other requirement for prospective application of the holding—the candidates' good faith and reasonable reliance on the statute repealing the contribution limits— is evident by the very fact that so many candidates from both parties availed themselves of the statute. Their good faith and reasonable reliance should be presumed. But as I understand the majority opinion, candidates will be deemed to have unreasonably relied on the statute simply if they had actual notice of a lawsuit challenging the statute, even a lawsuit to which they were not named as a party. However, no case (until now) has ever so held. Must all persons acting in reliance on a statute now stop in their tracks whenever they learn of a challenge to the statute? And whatever the merits of the challenge? The only case the majority cites in support of the proposition that the courts should "refus[e] prospective-only application of a decision to entities that clearly had notice of the litigation" is *Akin v. Missouri Gaming Comm'n*, 956 S.W.2d 261 (Mo. banc 1997). But that opinion is fundamentally miscast because the entities (the gaming companies) that were refused prospective application of the decision were the actual defendants in the lawsuit.

Even if non-parties are to be charged with notice of a lawsuit, it is certainly inappropriate to do so here because notice of this particular lawsuit could not have afforded fair notice of the actual grounds on which this Court ultimately rendered its decision. In other words, notice to non-parties that a suit was filed challenging a statute on certain grounds is not sufficient notice that the suit may be successfully challenged on grounds the parties failed to raise. That is the point the majority seems to make when it states that ". . . the issue of [the candidates'] actual notice of this litigation is undeveloped. Questions may arise whether the invalidity of the provision eliminating contribution limits was reasonably foreseeable by these persons." I see no need, however, to resolve those questions by referring the matter to an independent fact finder.

The challenge raised in plaintiff's petition was not specific to the repeal of the contribution limits, and as the majority concedes, there was no claim that the repeal of the contribution limits was itself unconstitutional. Instead, the exclusive focus was the alleged invalidity of sections 115.342 and 115.350 and the black-out provision of section 130.032.2. Even if these claims were well-taken, the parties (not to mention the candidates who were not parties) could reasonably rely on the presumption in section 1.140 that the invalid sections of H.B. 1900 were severable from the valid sections and that the bill would not be invalidated in its entirety. And, as expected, although the trial court did invalidate the challenged sections, the balance of the bill was left intact. Furthermore, at no time during the pendency of the case did the parties raise, or did the trial court address, the issue of the severability of the unconstitutional black-out period from the repeal of the campaign contribution limits. Indeed, the trial court's judgment is silent on the matter. It was not until May 4 that appellant Trout first raised the issue in the final point (no. 6) in his brief to this Court, and even then, the overriding focus of the brief, and thereaf-

ter of the state's brief, too, was the challenge to sections 115.342 and 115.350. In short, up to the time of appeal, this Court's invalidation of the repeal of campaign contribution limits was an apparently unforeseen *collateral consequence of the invalidation* of the black-out period, a consequence unforeseen even to the parties themselves. Under these circumstances, I would not impute notice to non-parties to the lawsuit, much less hold that they were not entitled to good faith reasonable reliance on the statute.

The best case on the application of the *Cardinal Glennon* prospective/retrospective analysis is the *Cardinal Glennon* case itself. In that case, this Court invalidated all of Chapter 538, a statutory scheme under which any person having a malpractice claim against a health care provider must refer the claim to the "Secretary of the Professional Liability Review Board Authority" before filing an action in court. *State ex rel. Cardinal Glennon Mem'l Hosp.*, 583 S.W.2d at 110. Chapter 538, the Court ruled, was invalid because it imposed a procedure as a precondition to access to the courts, in violation of the "open courts" provision of the Missouri Constitution. *Id.* One component of the statutory scheme in section 538.020 provided a means of tolling the statutes of limitations during the time required for the board to consider a malpractice claim and make its recommendations. In a supplemental opinion giving prospective application to the decision to the extent that it invalidated the tolling provision, this Court stated:

We are now reminded that during the period from the effective date of Chapter 538 until February 13, 1979, a substantial number of claims against health care providers have been submitted under Chapter 538 and that such claimants have undoubtedly relied on the protection afforded them by the tolling provision of section 538.020. . . . If the tolling provision of section 538.020 is viewed as retroactively unconstitutional, those claimants who have reasonably and in good faith relied upon section 538.020 to protect their rights to ultimately submit their claims to the courts would suffer a manifest injustice. We, therefore, order that the statutes of limitations shall be tolled pursuant to section 538.020 as to those claims submitted to the Professional Liability Review Board between the effective date of Chapter 538 and February 28, 1979 [the date of the supplemental opinion].

*Id.* at 118. I cannot fairly distinguish these circumstances from those in the case at hand. In my view, the many claimants who relied on the tolling of the statute of limitations (despite the suit contesting the statute's validity) are in no different position than the many candidates who relied on the repeal of the campaign contribution limits.[1]

Finally, it seems to me that the majority's remedy for determining whether retroactive application would work an injustice is itself unworkable. To assign this problem to the Ethics Commission for a case-by-case analysis of the injustice to each candidate will present a monumental task that likely is well beyond the re-

---

1. Although the majority discounts this holding because "the harm of retroactive application to all [claimants] was both uniform and readily ascertainable," it overlooks the fact that there was a corresponding and equally uniform and readily ascertainable harm to the many health care providers whose absolute defense of the statute of limitations was taken away. Ironically, under the majority's current analysis, the balancing of the uniform and readily ascertainable harms would have required the *Cardinal Glennon* Court to give retrospective effect to its decision.

sources of the Commission. As I understand the majority ruling, the Ethics Commission is now charged with investigating and prosecuting claims for refunds against scores of candidates who collected over-limit contributions and then determining whether an injustice would result by requiring refunds of the contributions. I see no practical way to accommodate that procedure during the current election cycle, especially considering the many appeals to the court system that are sure to follow. In addition, it will be a further injustice to the candidates themselves who will have to go to the additional time, expense, and trouble to defend themselves, and to do so in many instances where there is no other candidate against whom to weigh the so-called relative injustices. The better course was taken in *Cardinal Glennon* and in *Sumners,* the very two cases cited by the majority in support of its position that there must be an evaluation of the injustice to non-parties caused by the retrospective operation of a decision. In both of those cases, this Court applied the holdings prospectively to *all* persons potentially affected, *Cardinal Glennon,* 583 S.W.2d at 118; *Sumners v. Sumners,* 701 S.W.2d 720, 722–25 (Mo. banc 1985), and there was no effort to determine who had notice of the pending suit and who did not, nor to conduct a case-by-case analysis with independent fact finders to evaluate the relative injustices. The same approach should be made here. *See also In re Extension of Boundaries of Glaize Creek Sewer Dist. of Jefferson County,* 574 S.W.2d 357, 364–65 (Mo. banc 1978) (giving prospective application to all persons and entities potentially affected by decision invalidating statute pertaining to annexation of sewer districts because of injustice to those who relied on the statute); *Abernathy v. Sisters of St. Mary's,* 446 S.W.2d 599, 606 (Mo.1969) (giving prospective application to all persons potentially affected by decision elimi-

nating doctrine of charitable immunity because of injustice to those who relied on prior decisions).

For these reasons, I would hold that the decision invalidating the repeal of the campaign contribution limits should be applied prospectively from the date of the decision—July 19, 2007.